UNITED VANGUARD FUND, INC., United Funds, Inc.–United Science and Technology Fund, United New Concepts Fund, Inc., United Continental Income Fund, Inc., Waddell & Reed Funds, Inc.–Growth Fund, the Hillman Foundation, Inc., the Henry L. Hillman Foundation, HCC Investments, Inc., the Henry L. Hillman Trust, the Juliet Lea Hillman Trust, the Audrey Hilliard Hillman Trust, the Henry Lea Hillman, Jr., Trust and the William Talbott Hillman Trust, Plaintiffs,

v.

TAKECARE, INC., Jack R. Anderson, R. Judd Jessup, Richard M. Burdge, Sr., George E. Bello, Robert W. Jamplis and FHP International Corporation, Defendants.

Civil Action No. 13343.

Court of Chancery of Delaware, New Castle County.

Submitted: March 4, 1998.
Decided: June 8, 1998.

Michael D. Goldman, James F. Burnett (argued), Peter J. Walsh, Jr., Stephen C. Norman, and Matthew E. Fischer of Potter Anderson & Corroon, Wilmington; of counsel: Theodore Altman, and Barry Shalov of Gordon Altman Butowsky Weitzen Shalov & Wein, New York City, for plaintiffs.

Kenneth J. Nachbar (argued) of Morris, Nichols, Arsht & Tunnell, Wilmington; of counsel: Michael Joseph and Joseph O. Click of Dyer Ellis & Joseph, Washington, D.C., for defendants TakeCare, Inc.

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

This fee petition is before the Court on remand following the decision of the Delaware Supreme Court reversing an earlier ruling granting the defendants' motion for summary judgment. The underlying action was brought in January 1994, by the holders of approximately 22% of the common stock of TakeCare Inc. ("TakeCare" or the "Company"), a Delaware corporation, to enjoin the sale of TakeCare to FHP International Corp. ("FHP") and to compel a "fair auction" of the Company. After the defendants' actions mooted the lawsuit, the plaintiffs brought this fee petition seeking $4.8 million in attorney's fees and expenses for purportedly conferring a benefit on the stockholders of the corporation.

In late 1993, the directors and substantial stockholders of TakeCare, a health maintenance organization, decided that TakeCare should be sold. After engaging in a search for potential acquirors, TakeCare received two offers: (i) an all stock offer from United HealthCare Corp. ("United") valued at $65 per share; and (ii) a cash-and-stock offer from FHP valued at $62 per share. On January 9, 1994, after discussing the merits of both offers, the Board entered into a letter of intent with FHP. On January 17, Take-Care received an unsolicited offer from a new bidder, Foundation Health Corp. ("Foundation"), proposing an all-stock transaction valued at $72 per share.[1] The next day, January 18, the plaintiffs filed suit seeking to set aside the letter of intent which was set to expire by its terms on February 7, 1994. Ultimately, FHP acquired TakeCare for $80 per share.

In their complaint, the plaintiffs alleged, inter alia, that TakeCare impermissibly favored FHP in the bidding process, and also that a 1% breakup fee in the letter of intent precluded United, as well as other potential bidders, from treating a potential acquisition as a "pooling of interest," thus effectively preventing a "fair auction" of the Company. On January 19, 1994, the Court held a hearing on the plaintiffs' expedited discovery motion. Because Foundation had entered the bidding with its $72 per share offer, and because the bidding process was ongoing, the Court denied the plaintiffs' request for immediate expedited discovery on their preliminary injunction application, postponed all discovery until after the expiration of the letter of intent on February 7, and set a hearing date for March 1, 1994. At a hearing held on February 18, the Court suspended all discovery and vacated the March 1 hearing date.

Ultimately, the Company was acquired by FHP in a cash and stock deal valued at $80 per share. These events, which occurred after the filing of the litigation, mooted the plaintiffs' claims. Plaintiffs argue, however, that the litigation conferred a substantial benefit on TakeCare and its shareholders, resulting in the creation of a $271 million common fund, representing the entire difference in value between the initial $62 proposal and the final $80 merger transaction.

---

1. On January 30, a fourth bidder, PacifiCare Health Systems, made an offer valued at $68.50 per share consisting of cash, common stock and subordinated debt.

## II. PROCEDURAL POSTURE

On April 8, 1994, the plaintiffs and their counsel filed a motion for an award of attorney's fees and expenses for $4.8 million.[2] Thereafter, the parties filed cross-motions for summary judgment on the plaintiffs' fee application. By Memorandum Opinion dated November 8, 1996, this Court denied the plaintiffs' motion for summary judgment, and granted the defendants' cross-motion for summary judgment. *United Vanguard Fund v. TakeCare, Inc.*, C.A. No. 13343, Allen, C. (Nov. 19, 1996).[3] In his Opinion, then Chancellor Allen held that there was no causal connection between the filing of the lawsuit and the monetary benefit conferred upon TakeCare's shareholders. Beginning with the indisputable premise that Foundation's entrance into the bidding process on January 17, 1994, had nothing to do with the later filed litigation, the Court concluded, as a matter of law, that the benefit claimed by the plaintiffs (*i.e.* the higher price that was ultimately obtained) was caused by Foundation's $72 bid, and not by the litigation.

Plaintiffs appealed the Court's decision and the Supreme Court of Delaware reversed and remanded. On appeal, the Supreme Court stated that:

> [w]here, as here, a corporate defendant, after a complaint is filed, takes action that renders the claims asserted in the complaint moot, Delaware law imposes on it the burden of persuasion to show that no causal connection existed between the initiation of the suit and any later benefit to the shareholders.

*United Vanguard Fund v. TakeCare, Inc.*, 693 A.2d 1076, 1080 (1997). The Supreme Court stated that the reason for placing this rebuttable presumption on the defendants is because it is "the defendant, and not the plaintiff, who is in a position to know the reasons, events and decisions leading up to the defendant's actions." *Id.* The Supreme Court found that Chancellor Allen's opinion had failed to address the plaintiffs' argument that, notwithstanding Foundation's pre-lawsuit $72 bid, the litigation nevertheless paved the way for the increased bidding by removing four specific impediments to bidding that the defendants had allegedly erected: (i) certain management bonuses that TakeCare's chairman intended to recommend be paid to the Company's chief executive and chief financial officers; (ii) the 1% breakup fee that TakeCare agreed to pay FHP if TakeCare merged with another acquiror; (iii) a stock option that TakeCare's chairman had given FHP to purchase TakeCare shares that he and his wife personally owned; and (iv) the letter of intent's provision that the definitive agreement would not contain a fiduciary out clause. Thus, the Supreme Court remanded the case to this Court for a determination as to whether the defendants had met their burden of rebutting the presumption of causation favoring the plaintiffs by demonstrating that the lawsuit "did not in any way cause their action." *Id.* (quoting *Allied Artists Pictures Corp. v. Baron*, Del.Supr., 413 A.2d 876, 880 (1980)).

On March 3–4, 1998, the Court held an evidentiary hearing on the plaintiffs' fee petition. This is the post-hearing and post-briefing decision on the plaintiffs' petition. For the reasons set forth, *infra*, I find that the defendants have failed to rebut the presumption that there was a causal connection between the litigation and the corporate benefit conferred upon the Company. Further, I conclude that the lawsuit was meritorious when filed. I conclude, however, that the plaintiffs are not entitled to the full amount of the award requested.

## III. BACKGROUND

Many of the relevant background facts in this action are set forth in the prior opinions of the Supreme Court, *United Vanguard Fund v. TakeCare, Inc.*, Del.Supr., 693 A.2d 1076 (1997), and this Court, *United Vanguard Fund v. TakeCare, Inc.*, Del.Ch., C.A. No. 13343, Allen, C. (Nov. 19, 1996). There-

---

**2.** Pursuant to a stipulation entered into by the parties, $4.8 million was withheld from the total consideration paid in FHP's acquisition of Take-Care and set aside in a fund to pay any award that the Court might grant.

**3.** On November 19, 1996, the Court issued a revised opinion.

fore, I will limit the factual exposition in the opinion to facts not previously addressed or ones particularly relevant to my resolution of this matter on remand. Further, because I conclude that the plaintiffs are entitled to some award of fees and expenses, I will discuss the facts surrounding the plaintiffs' counsel's fee arrangements.

## A. *Letter of Intent*

By mid-December, 1993, TakeCare had received bids, from FHP and United, in response to its efforts to find a buyer. The initial FHP bid, received December 17, 1993, was for a combination of cash, preferred stock and common stock valued at approximately $60 per TakeCare share. The United proposal was to exchange .84 shares of its common stock, valued at approximately $65 per TakeCare share as of December 17, for each share of TakeCare common stock.

On December 18, 1993 and January 5, 1994, the TakeCare Board met to consider the FHP and United bids.[4] At the January 5 meeting, the Board was told that FHP had submitted a new bid valued at $62 per share together with a proposed letter of intent. The letter of intent provided that TakeCare grant FHP a thirty (30) day exclusive negotiation period during which the parties would finalize and execute a definitive agreement. The proposal also contained two "lock-up" fee provisions, including one intended to become effective upon the execution of the letter of intent. This first lock-up fee provision would trigger if the letter of intent terminated: (i) without the execution of a definitive merger agreement and (ii) the Company was acquired by a third party within one year. If triggered, TakeCare would be required to pay FHP 1% of the value of the proposed transaction, or approximately $8 million. The second lock-up fee provision would be included in the definitive merger agreement, and would require the Company to pay FHP 2% of the transaction, or approximately $16 million, if the merger was not consummated because of a breach by TakeCare or the

existence of an alternative proposal. The letter of intent also provided for the payment of transaction bonuses totaling $7.5 million in cash to Jessup and Dennis Gates, TakeCare's CFO.

The FHP proposal made several other demands. First, FHP required Jack Anderson, TakeCare's CEO, to grant it an option to purchase over one million shares of TakeCare stock, personally owned by him and his wife, at a price of $62 per share if: (i) there was a breach of the letter of intent, or (ii) TakeCare accepted a bid from another party at a price of $68 per share or less ("Anderson Option"). Second, FHP required that the definitive merger agreement contain no "fiduciary out" provision. Third, as mentioned above, TakeCare had to agree to negotiate exclusively with FHP until the expiration of the letter of intent on February 7, 1994.

At the January 5 meeting, Kidder Peabody & Co. ("Kidder"), the investment banker retained by TakeCare, and Alex, Brown & Sons, Inc. ("Alex Brown"), the investment banker retained by Hillman, made presentations analyzing the two bids. As of the meeting, neither banking firm was prepared to give a fairness opinion based only on their analyses of publicly available information.[5] Kidder's analysis (subject to due diligence) was that under certain circumstances the FHP proposal "approached" the United proposal in value. Alex Brown, representing Hillman, voiced concerns about the value and liquidity of the preferred stock offered by FHP and presented data demonstrating that United consistently outperformed FHP in terms of earnings and growth. After the presentation, the Board, by a five-to-three vote, voted to authorize TakeCare to enter into a letter of intent with FHP.

## B. *SEC No Action Letter*

Plaintiffs' Complaint asserted importantly that the 1% breakup fee would "blow" pooling of interest accounting treatment, thus preventing any potential bidder seeking such

---

4. At the time of United's acquisition of TakeCare, the TakeCare Board consisted of the following individuals: Jack R. Anderson, R. Judd Jessup, Richard M. Burdge, George E. Bello, Robert W. Jamplis, Russell Ayres, V. Gordon Clemons and Richard M. Johnston.

5. Neither Kidder nor Alex Brown had access to non-public information regarding TakeCare or the two bidders.

a transaction from making an offer for Take-Care. On February 1, 1994, after the filing of the Complaint, and after consultation with the Company's accountants, the defendants wrote to the SEC, Office of Chief Accountant, requesting advice regarding whether:

in the event the Company is ultimately acquired by United or another company desiring pooling accounting, and assuming all other requirements for pooling accounting are satisfied, the staff would not, in light of the facts and circumstances described below, object to pooling accounting treatment on the basis of the Company's payment of the agreed termination fee to FHP.[6]

On February 18, based on the representations made by the defendants in the February 1, 9 and 14 letters, the SEC Staff issued a "no action letter" ("No Action Letter"), advising that it would not object to pooling of interest accounting treatment for a business combination between TakeCare and a third party other than FHP.

On February 18, the same day the SEC issued its No Action Letter, the Court held a second conference with counsel for the parties. During this teleconference, TakeCare's counsel requested that all discovery be suspended and that the hearing date, scheduled for March 1, on the plaintiffs' preliminary injunction motion be vacated. Plaintiffs opposed termination of the proceedings due to the perceived threat the Anderson Option and the transaction bonuses continued to pose to a pooling of interests transaction. During the conference, FHP's counsel agreed that the Anderson Option would be exercisable only if the deal price fell back below $68 per share, thereby eliminating any risk that FHP could "bust" pooling by claiming a breach of the letter of intent. Further, the defendants' counsel agreed that they would not require the payment of transaction bonuses if it would impede pooling of interests accounting treatment. After these representations were made, the Court vacated the March 1 hearing date and suspended all discovery.

## C. Plaintiffs' Counsel's Fee Arrangement

The evidence in the record pertaining to plaintiffs' counsel's fee arrangement in this action is sparse, consisting mostly of the testimony of Barry Shalov, Esquire, of the firm of Gordon Altman Butowsky Weitzen Shalov & Wein ("Gordon Altman"). Shalov, who specializes in mergers and acquisitions, was in charge of Gordon Altman's representation of Hillman in connection with the TakeCare transaction. He is not a litigator, nevertheless, he testified that he often employs litigation as a tactic in transactional work and gives advice in that respect.

Shalov testified that he was retained in mid-December by H. Vaughan Blaxter, III, Hillman's Vice–President and General Counsel, and Russell W. Ayres, Hillman's Associate General Counsel and one of its two nominees on the TakeCare Board of Directors. At the time, they expressed to him their concern that the conduct of the process of selling TakeCare was not one best designed to obtain the highest value for TakeCare stockholders. Rather, they conveyed to Shalov their understanding that the defendants were engaging in a very limited auction without obtaining the advice of professionals (i.e . investment bankers) and were favoring a transaction with FHP for inappropriate reasons. Shalov understood that his firm's role would be to help Hillman foster or promote a process designed to achieve maximum value for the shareholders.

Shalov testified that, consistent with his usual practice, he did not obtain a written fee arrangement from Hillman.[7] His expectation, based on a single prior representation of

---

6. Defendants sent additional letters on February 9 and 14. The February 9 letter was sent in response to a request for information concerning the pending stockholder suit filed against Take-Care. The February 14 letter provided additional information regarding the lawsuit and the termination fee as well as other issues which were addressed in discussions between Take-Care's accountants, Ernst & Young, and SEC staff members.

7. Shalov testified that he also had no written fee arrangement with the other plaintiffs that he came to represent in the case. Further, Shalov testified that when Potter Anderson & Corroon was retained as Delaware counsel in the action, he told them what his expectation was and understood that they had the same expectation.

Hillman, was that Gordon Altman would be paid time plus a success fee, determined by Hillman.[8] Shalov did not testify that, before settlement negotiations began, there was any discussion with Blaxter or Ayres on the subject of a "success fee" or that there was any mutual understanding on that point.[9]

After the parties began to discuss settlement of their differences, Gordon Altman sent two different computer generated printouts representing the legal fees and expenses of plaintiffs' counsel in pursuing the litigation. The first is accompanied by a cover letter dated March 14, 1994 and is addressed to Blaxter. The bill is for fees and expenses in the amount of $1,670,965.51. Included in this amount is $750,000 representing an "agreed upon 'success fee.'" The testimony regarding this first bill is that Blaxter told Shalov to bill at his premium rate and to include a success fee. As indicated across the top of the cover letter, this bill was sent only for the purpose of settlement negotiations. The second bill, dated April 4, 1994, is also accompanied by a cover letter addressed to Blaxter. This revised bill provides for only regular billing rates as opposed to premium billing rates. It provides for fees and expenses in the amount of $804,491.84. Further, in lieu of the $750,000 success fee, the bill states that the success fee would be "such amount as plaintiffs, in their reasonable discretion determine to be appropriate or, if plaintiffs determine to petition the court for reimbursement of costs, such amount as may be determined by the court." Ultimately, the Hillmans made fee payments based on regular hourly rates and which did not include a success fee.

## IV. DISCUSSION

 Delaware courts have long acknowledged the "common corporate benefit," doctrine as a basis for awarding attorney's fees and expenses in corporate litigation. *See Goodrich v. E.F. Hutton Group, Inc.*, Del.Supr., 681 A.2d 1039 (1996). The principle underlying this doctrine is that where a litigant has conferred a common monetary benefit upon an identifiable class of stockholders, all of the stockholders should contribute to the costs of achieving that benefit. *Weinberger v. UOP, Inc.*, Del.Ch., 517 A.2d 653, 656 (1986). As a preliminary matter, however, in order to be entitled to an award of fees under the corporate benefit doctrine, the petitioner must demonstrate that: (i) the suit was meritorious when filed; (ii) the action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved;[10] and (iii) the resulting corporate benefit was causally related to the lawsuit. *TakeCare*, 693 A.2d at 1079. Further, as discussed *supra*, Delaware law entitles the plaintiffs to a presumption that a causal connection existed between the initiation of litigation and a benefit later conferred on the corporation in a situation where actions taken by the defendant after the filing of the complaint render asserted claims moot. *Id.* at 1080. Thus, in the present situation where the plaintiffs claim that the litigation caused the defendants to take action which mooted their claims but which created a common fund or other corporate benefit, fees will be awarded upon a showing that these elements have been satisfied. *Allied Artists Pictures Corp. v. Baron*, Del. Supr., 413 A.2d 876, 878 (1980).

### A. *Lawsuit was Meritorious when Filed*

 In assessing whether a lawsuit was meritorious when filed, the standard the Court will look to is whether the claim would have been able to withstand a motion to dismiss. *Chrysler Corp. v. Dann*, Del.Supr., 223 A.2d 384, 387 (1966). Further, at the

---

8. Blaxter testified, however, that no such success fee was ever paid to the Gordon Altman firm in regard to that prior matter.

9. In his deposition, Blaxter testified that he did not recall whether there was any discussion of a success bonus prior to his requesting an invoice from Gordon Altman. He also testified that he did not recall Shalov suggesting that a success bonus would be appropriate.

10. After the Board, including one of the two Hillman Board representatives, eventually voted to approve the sale of TakeCare to FHP, no judicial resolution was ever reached in this action. Therefore, an analysis of this element is unnecessary.

time of filing the complaint the plaintiffs must have possessed knowledge of provable facts which held out some reasonable likelihood of ultimate success. *Id.* There need not be an absolute assurance of ultimate success, rather, only that there be some reasonable hope. *Id.*

Plaintiffs' principal claims were two-fold: (i) that the 1% breakup fee in the letter of intent entered into between TakeCare and FHP impeded certain bids based upon pooling-of-interests accounting; and (ii) that the defendant directors breached their duties of care and loyalty by not fully informing themselves regarding the FHP offer and by not conducting a "fair auction" of TakeCare. The defendants argue that the No Action Letter determined that the breakup fee in the letter of intent did not preclude bids based on pooling of accounting and, therefore, the claim that it did was not meritorious when filed. As to the breach of fiduciary duty claims, the defendants assert that at the time the complaint was filed the bidding process was ongoing, the directors were endeavoring to attract other bidders, and therefore, that the complaint was prematurely filed.

### 1. Breakup fee

■ Defendants assert that the SEC No Action Letter vindicated their position that, as a matter of law, the termination fee had no impact on the ability of parties to engage in a pooling of interest transaction. Thus, they argue, the claim regarding the impact of the termination fee on pooling of interest accounting could not have survived a motion to dismiss. Plaintiffs do not meet this argument directly. Instead, they contend that the lawsuit caused the defendants to seek clarification from the SEC on the effect of the termination fee. Because the SEC no action letter provided significant comfort to potential bidders about the availability of pooling of interest accounting treatment in a transaction competing with FHP, the plaintiffs argue they were responsible for opening up the bidding process.

■ Initially, I note that the defendants never filed a motion to dismiss the Complaint at any point in the litigation. Moreover, the No Action Letter cannot be given the same effect as a judicial ruling on a motion to dismiss. *See Margolies v. Pope & Talbot, Inc.*, Del.Ch., C.A. No. 8244, 1986 WL 15145, Hartnett, V.C. (Dec. 23, 1986) (citing *Koss v. Securities and Exchange Comm.*, 364 F.Supp. 1321 (S.D.N.Y.1973) (stating that no action letter not *res judicata* and therefore not binding on Court)). Indeed, an SEC no action letter merely expresses a conclusion that, assuming the truthfulness, accuracy and completeness of the factual matters represented in the letter(s) requesting such advice, the staff of the SEC responding to the request (in this case, the Office of the Chief Accountant) will not recommend the commencement of enforcement action by the Commission.

Moreover, in issuing its letter, the SEC staff necessarily relied on the representations made in the letters of request sent to them. Most significantly, the February 1 letter to the SEC states:

> [t]he facts and circumstances under which the obligation to pay the termination fee arose show that it was not in contemplation of a business combination with another party. In fact, it was undertaken in part to discourage transactions other than the proposed transaction with FHP. Although the obligation was undertaken with reference to some subsequent business combination ... *the parties' expectation at the time it was undertaken was, of course, that there would be no such third-party transaction.*

(emphasis supplied).

Consistent with this representation, defendant Jessup testified in deposition that, as of the January 5 Board meeting, it was his view that the search for an acquiror was ended and that the process had been successful in eliciting FHP and United's best offers.

Defendants' position in opposing the fee petition is different. For example, Michael Joseph, Esquire, the defendants' attorney who drafted the February 1, 9 and 14 letters to the SEC, and who appeared as a witness at the hearing, testified that his February 1 letter, quoted *supra*, expressed the reasons why FHP favored a breakup fee and not the Company's purpose for entering into the agreement. Mr. Joseph's subjective belief as

to the meaning of this paragraph is not easily reconciled with the language of his letter to the SEC, written at a time when his clients' interests were different. Moreover, I note that the defendants now argue strenuously, and inconsistently with the representation quoted above, that the decision to enter into the letter of intent and related actions by the defendants were taken, in part, to induce others to bid.[11]

For these reasons, I cannot conclude that the allegations in the Complaint challenging the 1% break up fee would not have survived a motion to dismiss.

### 2. Fiduciary duty claim

The Complaint also contains a detailed account of the facts leading up to the January 5 meeting of the Board of Directors and claims that the defendant directors breached their duties of care and loyalty by not fully informing themselves regarding the FHP offer or the competing United offer, and by not conducting a "fair auction" of TakeCare. Specifically, the plaintiffs allege that the Board was unaware of the Anderson Option or of the impact the 1% breakup fee could have on the ability of third parties to engage in a pooling of interest transaction. The complaint also contains detailed allegations that Anderson improperly favored the FHP proposal and caused a majority of the Board of Directors to reject the superior proposal from United.

Defendants counter that the complaint was filed prematurely, that the bidding process was ongoing and that they were making every attempt to obtain the highest possible price. They argue that the Complaint's prematurity is demonstrated by the fact that it was filed a day after Foundation announced its $72 bid. They also disparage the Complaint for its failure to acknowledge the existence of that bid which, the defendants claim, undercut many of its allegations.

■ I cannot conclude that the Complaint was prematurely filed or that its detailed allegations of breach of fiduciary duty would not have withstood a motion to dismiss. It is true that the Foundation $72 bid challenged a central premise of the Complaint, i.e., that the letter of intent had the effect of obstructing all future bidding. Nevertheless, Foundation's bid did not vitiate the allegations in the complaint regarding the actions taken on January 5 or Anderson's actions in connection with the bidding process. The matters alleged in the Complaint, if proven, were sufficient to establish, at a minimum, that the provisions of the letter of intent were designed to and would have some present impact on the bidding process. In my view, this is sufficient for me to conclude that the Complaint would have survived a motion to dismiss.

### B. The Corporate Benefit was Causally Related to the Litigation

As stated earlier, the defendants bear the burden of demonstrating that there was no causal connection between the initiation of the lawsuit and any subsequent benefit to the shareholders. TakeCare, 693 A.2d at 1080. This is a heavy burden and it is to be expected that a defendant will not often be able to satisfy it. Thus, it is not surprising that, based on my review of the entire record before me, including the demeanor and testimony of the witnesses who appeared at the hearing, I find that the defendants have failed to overcome the presumption of causal relationship or, to put it differently, to establish the complete absence of any causal relationship between the litigation and their actions rendering moot the plaintiffs' claims.

■ Plaintiffs assert that the filing of the litigation caused the defendants to take action to remove certain impediments to an auction posed by the letter of intent, result-

---

11. By way of example, defendants point to the fact that the original draft of the letter of intent provided that there would be no press release announcing its execution. Defendants claim that, as a result of their insistence, the final draft included a clause requiring a press release, which would help to attract additional bids. Defendants also point to the fact that the initial draft of the letter of intent had an exclusivity provision which would have precluded TakeCare from "entertaining" or "soliciting" any alternative acquisition proposals. As with the press release provision, the defendants contend that they were responsible for having this language removed from the final draft, thus allowing TakeCare to hear presentations and receive proposals during the thirty-day exclusivity period.

ing in FHP acquiring the Company for $80 per share rather than $62 per share. As mentioned *supra*, the plaintiffs contend that the litigation helped remove four impediments and point to the following events occurring after initiation of litigation for support: (i) defendants' procurement of the SEC No Action Letter regarding the effect of the termination fee; (ii) FHP's counsel's concession at the February 18 conference with the Court that the Anderson Option would be exercisable only if the deal price fell back below $68 per share and not for breach of the letter of intent by TakeCare, thus removing any risk it posed to pooling of interest accounting treatment; (iii) defendants' agreement not to require the payment of management bonuses if such payment impeded pooling of interests accounting treatment; and (iv) the inclusion of a fiduciary out provision in the definitive merger agreement executed between FHP and TakeCare. More generally, the plaintiffs contend, the lawsuit contributed to the Board's decision to allow the letter of intent to lapse and to engage in a further bidding process.

Defendants hotly dispute that the lawsuit caused any benefit, removed any of the impediments to bidding, or paved the way for increased bidding. Most importantly, they argue that the bidding process was ongoing at the time the litigation was filed, as is evidenced by the January 17 Foundation bid. As to the particular events to which plaintiffs point, defendants respond as follows:

*The SEC No Action Letter:* As discussed above, the defendants take the position that the No Action Letter did not create a benefit for the TakeCare shareholders, but simply proved wrong the plaintiffs' claims about the impact of the 1% break up fee on the availability of pooling of interest accounting.

*The Anderson Option:* Defendants argue that the Anderson Option never served as an impediment to bidding after the $72 Foundation bid was made because (i) by the time the action was brought the bidding was already above the $68 per share trigger, and (ii) FHP never considered asserting a claim that the option was triggered by any breach of the letter of intent by TakeCare.[12]

*Management bonuses:* Defendants contend that Anderson's insistence on paying management bonuses in a transaction never impeded bidding because there was never an intention to do so if it would "bust" pooling of interest accounting treatment. Thus, they argue that the "concession" made during the February 18, 1994 telephone conference with the Court was of no moment.

*The Fiduciary Out Clause:* Defendants contend before the litigation was filed, FHP had acceded to TakeCare's request that the definitive documents contain a fiduciary out clause. Plaintiffs introduced no evidence to the contrary.

There is substantial evidence that, at the time the Board entered into the letter of intent with FHP, it was understood or should have been understood that the letter of intent would restrict the ability of other potential acquirors to bid. Moreover, there is reason to conclude that no other bids were expected to emerge once the letter of intent was approved. Among other things, the record is clear that the Board entered into the letter of intent with the understanding that the execution of a definitive agreement with FHP would follow soon thereafter.

At least in part as a result of the initiation of this lawsuit (and also as a result of Foundation's $72 bid and United's continued expression of interest), the Board later took actions to open up the bidding process, allowing other bidders interested in an all-stock transaction to make offers to acquire the

---

12. Defendants' contention that FHP never considered asserting a breach is not supported by the record. In FHP's January 28, 1994 letter to TakeCare, submitting its definitive agreement, FHP stated that it had no intention of surrendering any of its rights to receive payment providing that "[i]n the event of a breach by TakeCare of [the letter of intent], we presently would intend to pursue all remedies available to us, including

(without limitation) the exercise of our option rights under [the Anderson Option]." Further, in a memorandum dated February 25, 1994, FHP's counsel, Wachtell, Lipton, Rosen and Katz, outlined various causes of action that might be asserted by FHP with respect to its rights under the letter of intent. These facts suggest that FHP intended to hold TakeCare to the terms of the letter of intent.

Company. For example, the Board allowed the letter of intent to lapse and directed Kidder to take a more active role in soliciting final bids from interested bidders.[13] I also note that minutes of meetings of FHP's board of directors reveal lengthy discussion of the litigation, the receipt of advice from legal counsel as to the implications of a favorable or unfavorable outcome of the litigation, and the consideration of alternative courses of action, including the raising of its proposed offer, or in the alternative, pursuing the collection of the termination fee. Those minutes also reflect that in a conversation with FHP, Anderson stated that TakeCare's Board had decided to postpone any decision with respect to accepting FHP's offer while it considered its options in light of the receipt of three competing offers as well as the pending lawsuit.

For these reasons, and mindful of the Supreme Court's allocation of the burden of proof on the issue, I conclude that the litigation played some part in causing the defendants to take actions resulting in a benefit being conferred upon the shareholders. While it is not possible to identify precisely the degree to which the litigation caused such a benefit, and while other events, such as the Foundation $72 bid played larger roles than the litigation, I conclude that the sum total of all the defendants' activities were in part precipitated by the litigation, and further that they resulted in the Company entering into a final agreement higher than would have been the case had there been no lawsuit. *See In Re Dunkin' Donuts Shareholders Litigation*, Del.Ch., C.A. No. 10907, Chandler, V.C. (Nov. 27, 1990) Mem. Op. at 14 (stating that in establishing the necessary causal connection the benefit need not be directly and entirely attributable to the underlying litigation).

Because the plaintiffs have satisfied the requisite elements, they are entitled to attor-

ney's fees in connection with this lawsuit. The only remaining issue is a determination of the amount of a fee to award.

### C. Fee Award

Plaintiffs' fee application seeks an award of attorney's fees and expenses of $4.8 million. This amount is comprised of fees of $1,200,-000 million paid to Hillman's investment banker, Alex Brown, approximately $90,000 in disbursements and $3.5 million in attorneys fees, including approximately $800,000 in actual fees paid and a "success bonus" of roughly $2,700,000 claimed by Hillman's counsel. As discussed *supra*, under the "common corporate benefit" doctrine, a litigant is entitled to an award of attorney's fees and expenses for its effort in creating the benefit. *TakeCare*, 693 A.2d at 1079 (citing *Tandycrafts, Inc. v. Initio Partners*, Del. Supr., 562 A.2d 1162, 1164 (1989); *Dann*, 223 A.2d at 386). This doctrine is premised on the theory that "all of the stockholders ... benefitted from plaintiffs' action and should have to share in the costs of achieving that benefit." *Weinberger v. UOP, Inc.*, Del.Ch., 517 A.2d 653, 656 (1986).

### 1. *Alex Brown's fees cannot be recovered on this application*

 Before turning to the question of the award of attorneys' fees, I will address briefly the request for reimbursement of approximately $1.2 million paid by Hillman to Alex Brown. Alex Brown was hired by Hillman to provide investment banking advice and services to it in connection with potential transactions involving TakeCare. Alex Brown began providing such services before the January 5, 1994 board meeting, at which it appeared and made a presentation. A formal letter agreement containing the terms of its retention was signed on January 14, 1994. That letter agreement makes no mention of any purpose of retaining Alex Brown to provide services in the litigation.[14] Rather the proposed services, which are specified

13. In response to these letters, the Company received three offers: (i) Foundation's all-stock offer valued at $83 per share; (ii) PacifiCare's $76 per share offer; and (iii) FHP's final combined offer valued at $80 per share.

14. The only mention of any involvement in litigation is found in paragraph III under the heading

"Fees" in which Hillman agrees to compensate Alex Brown at its usual daily charges if any of its professionals are called upon to "assist in, or provide testimony (whether in trial or in deposition) for any action, suit or proceeding related to, or arising from Alex Brown's engagement hereunder."

in detail in the letter agreement, relate exclusively to the performance of financial advisory services in connection with potential transactions. Consistent with the terms of this letter, Theodore Altman, Esquire, the plaintiffs' lead litigation attorney and a Gordon Altman partner, testified that the Hillman entities retained Alex Brown to "assess the transaction that Anderson was sponsoring." Altman does not recall Alex Brown playing any role in the litigation.

There is nothing in the record that would substantiate a claim that Alex Brown performed any substantial services in connection with the litigation. Moreover, plaintiffs have made no effort to prove that any part of the fee paid to Alex Brown should or could properly be allocated to the litigation. In the circumstances, I am aware of no authority, nor has any been provided, to support the payment of such fees for non-litigation matters. As such, the plaintiffs are not entitled to reimbursement for any part of their expenses in retaining Alex Brown.

## 2. *Attorneys fees*

▮ In determining the amount of an award of fees in a given case, the Court considers: (i) the amount of time and effort applied to the case by counsel for the plaintiffs; (ii) the relative complexities of the litigation, including the skills applied to their resolution by counsel; (iii) the standing and ability of petitioning counsel; and (iv) the contingent nature of the litigation. The determination of the allowance of fees is a discretionary act, and is ascertained solely by reason of the benefit conferred on Take-Care's shareholders by reason of the litigation. *Dann*, 223 A.2d at 389.

▮ The first three elements are easily addressed. While the time between the filing of the lawsuit and the action taken by the defendants which mooted the case was relatively short, the plaintiffs did expend substantial time and effort drafting the Complaint and engaging in discovery, including taking depositions. As to the complexity of the litigation, I conclude that this action involved the types of complex legal and factual issues often encountered in litigation contesting proposed corporate transactions. Nonetheless, unlike much litigation of this type for

which fees are sought, no preliminary injunction hearing was held, nor were there any proceedings before the Court other than the January 19 hearing on the plaintiffs' expedited discovery motion, and the February 18 teleconference. As to the standing and ability of the plaintiffs' counsel, I find that they are well experienced in practicing before this Court and prosecuted this action in a diligent and competent manner.

### a. Plaintiffs are entitled to be reimbursed for the actual fees paid in connection with the litigation.

There is little question that, in light of the findings made above, the plaintiffs are entitled to recover from the class the amount of attorneys fees they paid to their counsel in connection with the litigation. Plaintiffs, however, are entitled to reimbursement only for those fees and expenses incurred while prosecuting the litigation. While this includes time spent preparing and drafting the Complaint, it does not include time expended on non-litigation activities before or after the filing of the Complaint. Plaintiffs' attorney's fees amount to $804, 491.84. From this amount I deduct $64,379, representing time expended on corporate matters prior to the prosecution of the litigation, as well $137,765 expended on non-litigation functions after the filing of the litigation. Plaintiffs, therefore, are entitled to reimbursement for attorney's fees in the amount of $602,347.84. Adding the $89,750 in expenses, brings the total to $692,097.84.

### b. Plaintiffs' counsel are not entitled to a "success bonus"

▮ The obstacle to awarding the "success bonus" sought by plaintiffs' counsel is that this litigation was not undertaken on a contingent fee basis. While Shalov testified as to his very loose expectation that the attorneys involved would receive a "success bonus" of an undefined amount, there is no doubt that: (i) all counsel involved for plaintiffs expected to be paid their normal hourly fees by Hillman, (ii) Hillman in fact paid only those normal hourly fees, and (iii) Hillman has not agreed to pay anything more than it has paid. Moreover, and importantly, there

is no question that whatever expectation Shalov had about receipt from Hillman of a "success bonus" was not, initially, related to the litigation at all. Rather, Shalov, a corporate lawyer, and Gordon Altman were retained to assist the Hillman interests in connection with a transaction between TakeCare and any potential acquiror, not in contemplation of litigation. Indeed, the first discussion of a success premium with Hillman did not occur until after the Complaint was filed, during a period when the parties were engaged in settlement negotiations relating to the overall situation, including the litigation.

The only case to which I am referred addressing the question of whether a success-based fee is permitted in circumstances where an action was undertaken on a partially contingent basis is *Sugarland Indus., Inc. v. Thomas,* Del.Supr., 420 A.2d 142 (1980). The factual circumstances surrounding the fee arrangement in *Sugarland* are so dissimilar from those in this matter that *Sugarland* does not support the award of a "success bonus" here.

In *Sugarland,* the plaintiffs agreed to be responsible for the payment of a minimum hourly rate of compensation to counsel who, nevertheless, expressly retained the right to petition this Court for "an allowance of attorneys fees predicated on the time involved and the results accomplished for the benefit of all shareholders." [15] Counsel further agreed that, should their petition be granted, any amounts so allowed "shall be credited to your obligation." The Delaware Supreme Court decided that the fee agreement (which it characterized as "not entirely contingent", *Sugarland,* 420 A.2d at 148) did not preclude plaintiffs' counsel from recovering an amount in excess of their hourly rates relying on several reasons not found here:

- The right to petition for fees was the basis on which plaintiffs' counsel agreed in writing with plaintiffs at the beginning of the representation.
- The written retention agreement contemplated legal services not only for plaintiffs but for the benefit of all Sugarland stockholders.
- "Since benefit to all shareholders was an objective of counsel and since the contemplated benefit achieved was within the scope of the fee contract, it would be patently unfair to now deprive petitioners of compensation based on the advantage which their efforts secured for all Sugarland stockholders."

*Sugarland,* 420 A.2d at 147–48.

Here, there is no written fee agreement and, thus, no clear record of any understanding as to a "success bonus" between counsel and their clients. As importantly, there is no evidence that, at the time this litigation was brought, plaintiffs and their counsel had even an oral agreement limiting the fees to be charged or contemplating the possibility of a later fee petition to the Court. Finally, the fee agreement in *Sugarland* specifically limited counsel to their "minimum" fees, obligated the clients to pay only for work performed through the application for a temporary restraining order, and contemplated that counsel would petition the Court for a success premium. There is no evidence of any similar understanding here.

In concluding that no award of fees in excess of those actually paid would be appropriate, I look in part to *In Re Dunkin' Donuts Shareholders Litigation,* Del.Ch., C.A. No. 10907, Chandler, V.C. (Nov. 27, 1990). In *Dunkin' Donuts,* as I have found to be true here, defendants failed to rebut the presumption of causation but did estab-

---

**15.** The fee arrangement letter sent to one of the plaintiffs provided in part as follows:

[a]s we previously advised you, our minimum hourly rates are $55 per hour for partners and $35 per hour for associates ... In connection with this employment ... [we] shall have the right to petition the Court for the allowance of attorney's fees and expenses, and the minimum hourly rates set forth herein shall not preclude [us] from petitioning the Court for allowance of attorney fees predicated upon the time involved and the results accomplished for the benefit of all the shareholders of Sugarland Industries, Inc ... You shall be individually and personally responsible ... for the payment of our fees and expenses ... which will be contributed by [you] through the Court's ruling on the motion for temporary injunction. Any amounts allowed to [us] as compensation or as reimbursement of expenses by the Court shall be credited to your obligation. ...

lish that the benefit for which class plaintiffs' counsel sought compensation was attributable, at least in part, to causes other than the litigation. *See Dunkin' Donuts* at 14 (citing *In Re Josephson International, Inc., Shareholders Litigation,* Del.Ch., C.A. No. 9546, 1988 WL 112909, Hartnett, V.C., (Oct. 9, 1988); *In Re Maxxam Group, Inc., Stockholders Litigation,* Del.Ch., C.A. No. 8636, 1987 WL 10016, Allen, C. (Apr. 16, 1987) (finding benefits attributable to causes other than litigation)). Because the Court in *Dunkin' Donuts* could not attribute the whole or any particular part of the claimed benefit to the results of the stockholder class litigation, then Vice Chancellor Chandler determined to award fees on a *quantum meruit* basis. *See also In re MacMillan, Inc., Shareholders Litigation,* Del.Ch., C.A. Nos. 9909, 9953, 1989 WL 137936, Jacobs, V.C. (Nov. 16, 1989). In so doing, he looked to the amount of fees paid by the proposed acquiror in related litigation as a rough measure of the value of class counsels' efforts.

In this case, plaintiffs' counsel claim responsibility for the entire difference between FHP's original $60 per share bid and its final offer of $80 per share, an increase valued at $271 million. I find that the benefit conferred by the litigation is not so easily quantifiable. To begin with, plaintiffs' counsel can claim no credit for the increased bidding level resulting from Foundation's pre-lawsuit $72 offer. Moreover, the litigation was, at most, only partially responsible for any further improvement in the price of the transaction. Weighing all of these circumstances, and given the indirect and tangential relationship between the litigation and the resulting transaction, I am unable to conclude that any fee based on a percentage of the increase in value is warranted. Rather, I am firmly convinced that the fee Hillman agreed to pay and actually paid plaintiffs' counsel for their litigation efforts is the best (and perhaps the only ascertainable) measure of the value of the services rendered by them in connection with the litigation. Having contracted for and received payment at their normal hourly rates and, thus, risked nothing on behalf of the class, plaintiffs' counsel are entitled only to what they bargained for, and no more.

## V. CONCLUSION

For all the foregoing reasons, the plaintiffs' are awarded attorney's fees totaling $602,347.84 and expenses totaling $89,750. The parties are directed to submit a form of order.