**EFiled: Oct 29 2014 12:33PM EDT**
**Transaction ID 56261807**
**Case No. 7865-VCN**

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

October 29, 2014

Christine S. Azar, Esquire
Labaton Sucharow LLP
300 Delaware Ave., Suite 1225
Wilmington, DE 19801

S. Mark Hurd, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
Wilmington, DE 19801

Ronald N. Brown, III, Esquire
Skadden, Arps, Slate,
  Meagher & Flom LLP
One Rodney Square
Wilmington, DE 19801

Raymond J. DiCamillo, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801

Re: *In re TPC Group Inc. Shareholders Litigation*
Consolidated C.A. No. 7865-VCN
Date Submitted: June 11, 2014

Dear Counsel:

This is a dispute about whether shareholders' efforts to challenge a merger caused a price increase and, if so, the amount of the fees to which their attorneys are entitled. Lead Plaintiffs Greater Pennsylvania Carpenters' Pension Fund and West Palm Beach Police Pension Fund (collectively, with other members of the

class, the "Plaintiffs") were shareholders of TPC Group Inc. ("TPC"). After TPC announced its acquisition by First Reserve Corporation, SK Capital Partners, and their affiliates (collectively, the "PE Group"), Plaintiffs brought a class action against TPC, the members of TPC's board of directors, and the PE Group (collectively, the "Defendants").

The early complaints, filed in September 2012, alleged a number of problems with the announced deal, such as inadequate price, breaches of fiduciary duty through an unfair process, and inadequate disclosures in the preliminary proxy. For example, one complaint alleged that "[n]umerous analysts also agree that the Proposed Transaction Price is inadequate" and cited an analyst's opinion that "the offer should have been $45 to $46 a share."[1] The process claims included conflicts arising from a management incentive plan, an agreement to forego a go-shop period, and a contingent fee arrangement with a key financial advisor, Perella Weinberg Partners LP ("Perella").[2] Disclosure claims involved concerns about the value of an alternative transaction, Perella's valuation analysis, and the

---

[1] Verified Class Action Compl. ¶ 60, Sept. 14, 2012 (original complaint of Greater Pennsylvania Carpenters' Pension Fund).
[2] *See, e.g.*, *id.* ¶¶ 64, 69, 73.

effectiveness of the special committee's work, to name a few.[3]  Subsequent bidding

and a supplemental proxy statement issued on November 21, 2012, have mooted

Plaintiffs' claims,[4] and the Court has awarded attorneys' fees for the disclosures

resulting from Plaintiffs' efforts.[5]

Remaining for the Court is whether (and, if so, to what extent) Plaintiffs are

entitled to attorneys' fees for the $5 per share ($79 million aggregate) increase in

the merger price achieved between the commencement of this litigation and the

acquisition's closing under an amended merger agreement.  Plaintiffs argue that

their legal challenge caused the PE Group to raise its bid from $40 to $45 per

share[6] and that $3,150,000 would be a reasonable award.[7]  Defendants contend that

a competing proposal, not the litigation, caused the price bump.[8]

---

[3] *See, e.g.*, *id.* ¶¶ 84, 93, 101.

[4] *See In re TPC Gp. Inc. S'holders Litig.*, C.A. No. 7865-VCN (Del. Ch. Feb. 6, 2013) (Stipulated Order Dismissing Action as Moot).

[5] *In re TPC Gp. Inc. S'holders Litig.*, C.A. No. 7865-VCN, at 71 (Del. Ch. July 11, 2014) (TRANSCRIPT).

[6] The Court assumes general familiarity with the facts, as presented in prior proceedings. *See In re TPC Gp. Inc. S'holders Litig.*, C.A. No. 7865-VCN (Del. Ch. July 11, 2014) (TRANSCRIPT); *In re TPC Gp. Inc. S'holders Litig.*, 2014 WL 1394369 (Del. Ch. Apr. 10, 2014).  Briefly stated, TPC announced its acquisition by the PE Group on August 27, 2012.  Shortly thereafter, a major

When plaintiffs seek attorneys' fees for legal action that was subsequently

mooted or settled by actions of defendants, plaintiffs must show that "(1) the suit

---

shareholder issued the first of several public criticisms of the merger. Aff. of Rachel E. Horn, Esq. in Supp. of Defs.' Sur-Reply in Further Opp'n to Pls.' Appl. for Award of Att'ys' Fees and Expenses ("Horn Aff.") Ex. E, at 1. The first complaint in this action was filed on September 4. On October 5, TPC received an unsolicited proposal from a competing bidder expressing interest in acquiring TPC for a price ranging from $44 to $46 per share. TPC subsequently issued a press release acknowledging the proposal and reiterating its support for the PE Group transaction. The PE Group responded, on October 11, with a letter to the Board explaining the advantages, including certainty, of its offer over the competing proposal. An internal memorandum from October 22, however, indicated that the PE Group considered the competing proposal a meaningful development warranting an increase in price. Horn Aff. Ex. E, at 1-2. Plaintiffs served Defendants with an expert's criticism of Perella's fairness opinion on October 29 and the opening brief for Plaintiffs' motion for a preliminary injunction on November 3. Two days later, TPC filed its definitive proxy statement with the SEC, and the PE Group raised its bid to $44 per share. Ensuing negotiations with Perella resulted in an increase to $45 per share. When the competing bidder raised its proposal to $47.50 per share, the PE Group responded with a press release emphasizing the "highly conditional" nature of that proposal. The PE Group's offer contemplated consummation before the end of the year, and the competing bidder withdrew in December. The PE Group deal closed on December 20, 2012.

[7] In their briefs, Plaintiffs asked for a total of $3.9 million, which was to include $750,000 for the benefit conferred by supplemental disclosures. *See* Pls.' Opening Br. for Appl. for Award of Att'ys' Fees and Expenses ("Pls.' Opening Br.") 38-39. The Court awarded $400,000 in fees and expenses for the disclosures. *In re TPC Gp. Inc. S'holders Litig.*, C.A. No. 7865-VCN, at 71 (Del. Ch. July 11, 2014) (TRANSCRIPT).

[8] Defs.' Br. in Opp'n to Pls.' Appl. for Award of Att'ys' Fees and Expenses ("Defs.' Opp'n Br.") 36-37.

was meritorious when filed; (2) the action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved; and (3) the resulting corporate benefit was causally related to the lawsuit."[9]  There is, however, a rebuttable presumption that the defendants bear the "burden of persuasion to show that no causal connection existed between the initiation of the suit and any later benefit to the shareholders" because the defendants are "in a position to know the reasons, events and decisions leading up to the defendant[s'] action."[10]  If attorneys' fees are warranted, the Court determines an appropriate amount by weighing, under the *Sugarland* standard, "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved."[11]

The critical issue here is causation, and Delaware law presumes that plaintiffs are a cause.  Defendants bear the burden of proving, by the preponderance of the evidence, that no causal connection (whether direct or

---

[9] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997) (citing *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980)).

[10] *Id.* at 1080 (internal quotation marks omitted).

[11] *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012) (discussing *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149-50 (Del. 1980)).

indirect) existed between the price increase and the plaintiffs' litigation efforts.[12]

The burden falls on defendants because they are in a better position to explain their

own actions. While the burden is heavy,[13] the presumption is rebuttable. To

overcome the presumption, defendants must prove "'that the nonexistence of the

presumed fact is more probable than its existence.'"[14]

Here, the primary negotiators for the PE Group state that they were

concerned about the October 5 competing proposal, negative publicity, public

opposition by a significant stockholder, and the potential for an unfavorable

evaluation by Institutional Shareholder Services ("ISS") when deciding whether

the PE Group should raise its bid.[15] They explain that the PE Group decided to

raise its price in mid-October but waited to contact TPC until the definitive proxy

was filed in order to avoid delaying the transaction.[16] The PE Group's affidavits

---

[12] *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417-18 (Del. 2010).

[13] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 727 A.2d 844, 852 (Del. Ch. 1998) ("This is a heavy burden and it is to be expected that a defendant will not often be able to satisfy it.").

[14] *Alaska Elec. Pension Fund*, 988 A.2d at 418 (quoting D.R.E. 301(a)).

[15] Aff. of Jack Norris in Supp. of Defs.' Opp'n Br. ("Norris Aff.") ¶ 4; Aff. of Neil A. Wizel in Supp. of Defs.' Opp'n Br. ("Wizel Aff.") ¶ 4.

[16] Norris Aff. ¶¶ 6, 8; Wizel Aff. ¶¶ 6, 8.

may be, as characterized by Plaintiffs, self-serving, but that is almost inevitable in matters of this nature. Given the current record, the Court finds no reason to discredit the statements that "the decision to increase the offer price had no relationship whatsoever to the litigation brought by Plaintiffs."[17] It is necessary to consider the factual context, both that generally exists during a transaction like this and, more importantly, that served as the specific background for the TPC acquisition. The Court has tried to analyze different scenarios in which the litigation may have been an indirect cause of the price increase, but Defendants' account is the most credible and is consistent with the record.[18]

---

[17] Norris Aff. ¶ 13; Wizel Aff. ¶ 13. There may have been some inconsistencies in certain statements, but they do not suggest disingenuousness about the PE Group's lack of reaction to the litigation. Nor does the Court take issue with the lead negotiators speaking on behalf of the entire deal team.

[18] *See, e.g.*, Horn Aff. Ex. B ("Wizel Dep."), at 31 ("[B]ased on our discussions, I didn't view the litigation as a risk to our ability to close the transaction; therefore, [I] chose not to spend time on it."); Ex. D ("Norris Dep."), at 62 ("I can say with absolute certainty what drove our decision, and that was that there was a competing bidder at a higher share price."); Ex. E, at 2 ("Subject to IC approval, FRC/SK will publicly announce our offer price increase to $44/share in advance of the ISS meeting noted above[.]"). That Defendants have redacted portions of documents because of attorney-client privilege does not change the Court's view. This is a common practice in our adversarial system. Plaintiffs have not provided any basis for piercing the attorney-client privilege.

It is tempting to assume that litigation challenging a transaction will influence the conduct of buyers, perhaps in ways even they do not understand. Moreover, it is reasonable to hold the view that a price increase will reduce shareholder litigants' likelihood of success or fervor for pursuing the litigation. Yet in this era, almost every merger of a public company is greeted with litigation, and relatively few price increases result. When a buyer knows that litigation is inevitable,[19] ensuing litigation does not necessarily have any effect on its

---

Although the PE Group admitted that "negative publicity," such as from articles mentioning the shareholder litigation, was a concern, the preponderance of the evidence shows that it *acted* upon its concern that a higher, competing proposal would prevent it from closing the transaction. Plaintiffs also contend that a white paper issued by a major shareholder raised issues "very similar" to those raised in the earlier complaints and that the PE Group was concerned about that public criticism. Pls.' Reply Br. in Supp. of Appl. for Award of Att'ys' Fees and Expenses 3. Yet this is not evidence of causation. The major shareholder first criticized the deal in late August. Its first white paper was issued on September 9, shortly after the first complaint, but there is no reason to conclude that the Plaintiffs were somehow responsible for that major shareholder's actions.

[19] *See* Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 Tex. L. Rev. (forthcoming Feb. 2015). One study concluded that 93 percent of public-target-company deals valued over $100 million—and 96 percent of those valued over $500 million—were challenged by shareholders in 2012. Robert M. Daines & Olga Koumrian, *Shareholder Litigation Involving Mergers and Acquisitions*, Cornerstone Research, 1 (Feb. 2013),

conduct.[20]   If litigation necessarily motivates a buyer to raise its price, then the presumption as to causation would not be rebuttable; the question of causation would be simplified from was the litigation a cause to how much of a cause was the litigation.   Finally, it would be unreasonable to conclude that allegations in Plaintiffs' complaint motivated the competing bidder.[21]   Thus, the Court finds that it is more likely than not that Plaintiffs' litigation did not, directly or indirectly, cause the PE Group, to any extent, to increase its bid.[22]

---

http://www.cornerstone.com/getattachment/9d8fd78f-7807-485a-a8fc-4ec4182ded d6/Shareholder-Litigation-Involving-Mergers-and-Acqui.aspx.   Although the data may not be complete, a majority of those actions settled, and, of the settlements, roughly four-fifths resulted only in additional disclosures. *Id.* at 5-6.

[20] *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.05[d][2], at 9-255 (2014) ("Thus, it is clear that the mere pendency of litigation does not, in and of itself, establish a causal connection between the plaintiffs' efforts and any beneficial changes that may ensue.").

[21] It seems unlikely that a serious bidder would rely on a shareholder complaint to form its bid, and the record does not suggest that this occurred here.  The same logic applies to the PE Group's decision to raise its bid—and ISS's evaluation of that bid.  Furthermore, the additional disclosures of November 21, 2012, could not have informed the competing proposal of October 5, 2012.

[22] With that conclusion, it is not necessary to decide whether Plaintiffs' claims (excluding those related to disclosure) were meritorious when filed.

The difficult aspect of this case is not whether to award Plaintiffs roughly $3 million or to award nothing. No matter how the evidence is weighed, Plaintiffs' contributions (or that to which they are entitled to credit for having caused) were minimal. The litigation achieved no defined benefit that might have facilitated a price increase. For example, deal protection measures were not modified.[23] Closing was not delayed; a delay would have extended the time available for a competing proposal. Plaintiffs' arguments condense to something akin to: (1) the litigation must have influenced what the PE Group did, and (2) Defendants simply cannot exclude every conceivable indirect cause.[24]

Ultimately, Plaintiffs did not cause the price increase in any way, and the Court need not proceed to a *Sugarland* analysis. Plaintiffs' application for an

---

[23] *Cf. In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011) (awarding attorneys' fees where mooted litigation caused a removal of deal protection devices and rescission of a rights plan).

[24] Assuming *arguendo* that the Court were to find that Defendants have not excluded every indirect cause attributable to Plaintiffs, the fee would fall under $200,000. A fee in that range would be difficult to justify, but it could be based on perhaps a 1 percent increase in the possibility of a topping bid. With that as the benefit, assuming the full $5 per share increase, a 20 percent award would yield a fee of approximately $158,000.

award of attorneys' fees and expenses for the increase in the merger price is

denied.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:     Register in Chancery-K