# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL D. JUDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Consol. C.A. No. 4662-VCL |
| | ) | |
| PREFERRED COMMUNICATION SYSTEMS, INC., a Delaware corporation, CHARLES M. AUSTIN, and GERALD E. SETKA, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  June 29, 2016,
Date Decided:  September 19, 2016

Michael W. McDermott, David B. Anthony, BERGER HARRIS LLP, Wilmington, Delaware; *Counsel for Plaintiff Michael Judy.*

Joseph B. Cicero, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; *Counsel for the Special Committee of Defendant Preferred Communication Systems, Inc.*

Brian M. Rostocki, John C. Cordrey, REED SMITH LLP, Wilmington, Delaware; *Counsel for Intervenor Preferred Spectrum Investments, LLC.*

Evan O. Williford, Andrew Huber, THE WILLIFORD LAW FIRM LLC, Wilmington, Delaware; *Counsel for Intervenor Preferred Investors Association.*

**LASTER, Vice Chancellor.**

Preferred Spectrum Investments, LLC ("PSI") seeks to recover $20 million as an award of attorneys' fees and expenses from Preferred Communication Systems, Inc. (the "Company" or "PCSI"). PSI claims it is entitled to this amount because it provided the funding necessary for plaintiff Michael Judy to pursue three pieces of litigation that were filed separately and then consolidated into this action: (i) a summary proceeding to obtain books and records, (ii) a summary proceeding to compel the holding of an annual meeting, and (iii) a plenary action challenging the authority of the individual then running the Company and the validity of certain actions he took.

PSI claims that because Judy prevailed in the litigation, the Company was able to preserve its ownership of two blocks of wireless licenses that constituted the Company's primary assets. The Company subsequently sold one block of licenses for $60 million, and PSI values the other block of licenses at $40 million. PSI contends it should receive one third of the after-tax value of the aggregate $100 million benefit. PSI posits a tax rate of 40%, yielding an after-tax benefit of $60 million, and an award of $20 million.

As a fallback, PSI contends it should recover $4,059,099.12, representing expenses that PSI claims to have incurred. PSI contends it actually incurred $8,257,717.52 in expenses, but during a period when individuals affiliated with PSI also held positions with the Company, it made partial payment of the amounts due, leaving the amount PSI now seeks.

The original $8,257,717.52 appears grossly inflated. Of the total amount, PSI claims to have expended $4,198,618.40 for lawyers and other law-related expenses, but PSI admits that not all of those fees and expenses were for Judy's litigation efforts in this

1

action. A substantial portion of the fees went to fund lawyers for individuals who PSI encouraged to intervene and assert personal claims for equity or other securities from the Company. Another substantial portion of the fees were for lawyers who appeared in proceedings before the Federal Communications Commission (the "FCC"), where PSI took positions adverse to the interests of the Company.

The remaining $4,059,099.12 that PSI claims to have incurred is even worse. This amount includes virtually every business expense that PSI incurred to manage its operations over a period of eight years. It includes items such as the compensation that PSI paid to members of its management committee, commissions that PSI paid for its own financing transactions, and fees that PSI paid to hire an executive search firm. It includes routine corporate expenses such as accounting services, bookkeeping costs, banking fees, and office supplies. It even includes the interest PSI paid to borrow the funds that it used to pay for its other expenses.

For multiple reasons, PSI's motion is denied. First, PSI lacks standing to seek a fee award. PSI was neither the plaintiff nor plaintiff's counsel. PSI gratuitously financed litigation nominally being conducted by Judy. As a volunteer financier, PSI cannot seek an equitable fee award.

Second, PSI cannot obtain a fee award because it financed Judy's litigation as part of an attempt to take over the Company. This court has held that parties cannot obtain an equitable fee award when they use litigation in support of a takeover.

Third, PSI cannot establish the necessary causal connection between its litigation financing and the value of the licenses. There are too many intervening steps for PSI to be able to claim responsibility for $100 million in value.

Finally, PSI cannot recover a *quantum meruit* award, and in any event cannot recover all of the expenses it has claimed. Under no circumstances can PSI recover the amounts it spent to hire lawyers for individuals to pursue personal claims against the company or for lawyers to appear before the FCC and take positions adverse to the Company. Nor can PSI recover the myriad of ordinary business expenses that it has included in its petition.

## I.    FACTUAL BACKGROUND

PSI has made its fee application in a case that was litigated through trial to judgment. The facts are drawn from a combination of sources, including (i) the trial record and the court's earlier rulings in the case, (ii) the submissions made by the parties in connection with the application for an award of attorneys' fees and expenses, and (iii) pertinent public records that are subject to judicial notice.[1]

---

[1] *See* D.R.E. 201(b); *Aequitas Sols., Inc. v. Anderson*, 2012 WL 2903324, at *3 (Del. Ch. June 25, 2012) (taking judicial notice of a pleading filed in a related action); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 1992 WL 212595, at *11–12 (Del. Ch. Sept. 1, 1992) (taking judicial notice, in a motion to dismiss context, of documents of public record); *see also In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007) (Rule 201 permits a court to take judicial notice of "documents [outside the pleadings] that are required by law to be filed, and are actually filed, with federal or state officials") (footnote omitted).

The factual background is lengthy because of the strange nature of PSI's application, which seeks in the first instance to obtain a "fee award" equal to one-third of the value of the Company's assets, and in the alternative to recover eight years worth of legal and business expenses. These broad claims make it is necessary to provide the background required to place those requests in context.

## A. The Company And Its Original Buy-And-Flip Strategy

The Company is a Delaware corporation formed on January 15, 1998. It has a complex and troubled history.

The Company arose from a scheme by Pendleton C. Waugh to acquire a critical mass of specialized mobile radio licenses for sites located in the U.S. Virgin Islands and Puerto Rico, then flip them within six months to a year to Telecellular, Inc., an aspiring cellular telephone operator. At the time, Waugh was President and a director of Telecellular. Due to the various means by which the FCC historically licensed spectrum, many of the licenses that Waugh sought to acquire were held by individuals having varying degrees of financial and legal sophistication.

Waugh had a lengthy and checkered record in the cellular telephone industry. In 1990, he formed Express Communications, Inc. ("Express"), a company that also engaged in the business of acquiring wireless licenses. In 1993, federal authorities began investigating Express's activities. In 1994, Waugh was indicted in the United States District Court for the Northern District of Texas on one count of conspiracy to structure financial transactions to evade securities and banking reporting requirements and one

count of money laundering, both felonies.[2] Waugh pled guilty to the conspiracy count, and the money laundering count was dismissed.[3] In 1995, he was sentenced to twenty-one months in federal prison (later reduced to fifteen months), three years probation, and the payment of $20,000 in fines.[4] In 1997, during the same period when Waugh was developing his plan for the Company, the United States District Court for the District of Columbia granted summary judgment against Waugh in a civil action brought by the SEC for securities law violations relating to Express. Waugh was ordered to disgorge nearly $13 million in illegally acquired funds and was enjoined permanently from violating various securities laws.[5]

Waugh brought Charles M. Austin into his buy-and-flip scheme. Austin previously had worked to acquire licenses for PCC Management Corp., another of Waugh's companies. Evidencing his own regard for legal compliance, Austin never bothered to file a state or federal income tax return between 1997 and 2010.

Waugh and Austin brought in Jay Bishop, whose record in the cellular industry rivaled Waugh's. In the early 1990s, Bishop was one of three stockholder principals in Continental Wireless Cable Television, Inc. ("Continental"), another company that engaged in the business of acquiring wireless licenses. In 1994, the SEC filed an

---

[2] *See* Indictment, *United States v. Waugh*, No. 3:94-CR-160-T (N.D. Tex. May 11, 1994).

[3] *See* Plea Agreement, *Waugh*, No. 3:94-CR-160-T.

[4] *See* Judgment, *Waugh*, No. 3:94-CR-160-T.

[5] *See S.E.C. v. Express Commc'ns, Inc.*, No. 95-CV-2268 (D.D.C. Mar. 7, 1997).

enforcement action against Continental for defrauding investors, obtained a restraining order against Continental, seized its assets, and froze the bank accounts of the company and its principals.[6] Bishop was eventually prosecuted by the IRS and convicted in 2001 of two felonies: conspiracy to defraud the IRS and attempted tax evasion while a principal of Continental. Bishop was sentenced to thirty months in federal prison.

Bishop added Charles Guskey to the mix. Guskey had worked for Continental as one of Bishop's accountants.

Among the four original participants, Austin's role was to serve as the front man for the Company. Earlier in this case, after trial, this court made the following finding of fact:

> [B]ecause Bishop and Waugh were convicted felons, and because the FCC looks askance at felons and fraudsters controlling (directly or indirectly) cellular communications licenses, Waugh, Bishop, Guskey, and Austin sought to conceal Waugh and Bishop's involvement. To that end, Austin always acted as the front man for the group, and Waugh and Bishop never held any official positions with PCSI. Despite foregoing any official roles, Waugh and Bishop in fact acted as principals of PCSI, participated in its operations, and made decisions on behalf of PCSI.

Dkt. 432, ¶ 4.

## B.     The Company's Strategy Changes

Beginning in 1998, the Company successfully assembled eighty-six licenses to operate a cellular telephone business in Puerto Rico and the U.S. Virgin Islands (the

---

[6] See Press Release, Securities and Exchange Commission, Continental Wireless Cable Television, Inc. (May 21, 2002), *available at* http://sec.gov/divisions/enforce/claims/contwire.htm.

"PR/VI Licenses"). Nine of the PR/VI Licenses subsequently expired for lack of renewal.

The Company assembled the PR/VI Licenses by acquiring them from individuals in return for packages of consideration that typically included securities in the Company. The Company also successfully obtained a set of thirty-eight licenses that gave the Company the right to use mobile radio frequencies in nine specified economic areas, predominantly clustered in the continental United States in Virginia and California (the "CONUS Licenses").

In 1999, the plan to flip the licenses to Telecellular foundered after Waugh encountered further legal difficulties. The FCC described them as follows:

> In 1999, Waugh was convicted of securities fraud, a felony, in a case brought by the State of Texas, arising from his failure, in 1993, to disclose to a potential investor that he was under investigation by federal authorities for activities relating to his involvement in Express. Waugh was sentenced to four years in state prison, all of which were suspended pending successful completion of probation. He also was ordered to pay $72,000 in restitution and to complete 500 hours of community service.
>
> Later in 1999, Waugh was determined to have violated the terms of his parole from federal prison and his probation on his state conviction by traveling to Puerto Rico to engage in activities relating to cellular telephone securities. As a result, Waugh was sentenced to six additional months in federal prison and four years in state prison.[7]

The reference to Waugh "traveling to Puerto Rico to engage in activities relating to cellular telephone securities" involved a trip with Austin to obtain the PR/VI Licenses for the Company.

---

[7] *Pendleton C. Waugh*, 22 F.C.C.R. 13363, 13365-66 (2007); *see* Judgment for Revocation of Probation, *Waugh*, No. 3:94-CR-160-T; *Texas v. Waugh*, No. F-9703517 (Crim. Dist. Ct. Dallas, Tex., May 17, 1999).

With the assemble-and-flip strategy no longer viable, the four original founders re-oriented the Company towards the more challenging task of becoming a full service wireless telecommunications provider. Ostensibly to fund this plan, the Company raised money by issuing a variety of poorly documented securities to outside investors. When issuing these securities and engaging in related transactions, the Company did not follow corporate formalities. Earlier in this case, this court made the following finding of fact after trial:

> To use a technical corporate term, [the Company] was a mess. Its founders did not follow corporate formalities and took dramatically different positions regarding the [C]ompany's capital structure depending on whether they were dealing with regulatory authorities like the FCC, potential investors, or the Court. It is not possible to reconcile all of the conflicting evidence into a single coherent account, nor is it possible to harmonize all of the various transactions in which [the Company] engaged or the types of securities that ostensibly were issued.

Dkt. 433, ¶ 5.

This court has determined that the Company originally had two classes of stock: Common Stock, par value $.001 per share (the "Original Common Stock") and Series A Preferred Stock, par value $.001 per share (the "Series A Preferred Stock"). In 2007, the Company purported to effectuate a reorganization that would have resulted in the Company having four classes of stock: Class A Common Stock, par value $.001 per share (the "Class A Common Stock"), Class B Common Stock, par value $.001 per share (the "Class B Common Stock"), Series A Preferred Stock, and Series B Preferred Stock, par value $.001 per share (the "Series B Preferred Stock"). The reorganization had the following components: (i) a forward split of the shares of Original Common Stock on a

8

2:1 basis; (ii) a reclassification of the Original Common Stock into Class A Common Stock; (iii) the creation of the new Class B Common Stock; and (iv) the modification of the dividend rights of the holders of the Series A Preferred Stock by reducing their annual dividend rate from 11% to 6%. The Company sold the resulting securities to investors. This court has determined after trial that the reorganization was invalid.

The Company also raised money by issuing debt. In April 2006, the Company completed a private offering of promissory notes, due in nine months, and issued in units of $25,000. The investors were promised repayment of the principal and interest, plus warrant coverage. The notes came due at various points in 2007.

It is not clear what progress, if any, the Company made during this period to build out a cellular telephone network or become a cellular telephone provider. The Company's primary business activity appears to have been inducing individuals to buy its securities.

## C. The FCC Investigation And Order To Show Cause

In July 2007, after conducting a preliminary investigation, the FCC issued an Order to Show Cause to Waugh, Austin, Bishop, the Company, and the Company's wholly-owned subsidiary, Preferred Acquisition, Inc., which was the entity that owned both the PR/VI Licenses and the CONUS Licenses (the "Licenses Sub"). Through the Order to Show Cause, the FCC initiated formal enforcement proceedings to determine whether the named individuals were qualified to be FCC licensees. The FCC summarized its reasoning for issuing the Order to Show Cause as follows:

> The record before us indicates that these individuals, two of whom are convicted felons, and the referenced entities, individually and collectively, among other things, apparently (1) failed to disclose a real-party-in-interest

9

and engaged in unauthorized transfers of control of Commission licenses; (2) misrepresented material facts to the Commission; (3) lacked candor in their dealings with the Commission; (4) failed to disclose the involvement of convicted felons in ownership and control of the licenses; (5) failed to file required forms and information and respond fully to Enforcement Bureau letters of inquiry; and (6) discontinued operation of certain licenses. Evidence of such misconduct raises material and substantial questions requiring further inquiry at hearing as to whether the referenced licenses should be revoked and whether forfeitures should issue against one or more of the persons and/or entities identified above.

*Pendleton C. Waugh*, 22 F.C.C.R. at 13364.

The Order to Show Cause posed an existential threat to the Company. If the FCC revoked the Company's licenses, then it would no longer have any valuable assets.

By late 2007, the Order to Show Cause had driven "a wedge between Waugh and Austin." Dkt. 432, ¶ 4. Before the FCC enforcement proceeding, Waugh was "the principal decision-maker for [the Company], with Austin acting as a figurehead." *Id.* After the FCC enforcement proceeding, Austin tried to distance the Company from Waugh. Austin was able to do this because the original certificate of incorporation identified Austin as the sole director of the corporation. Shortly after the Company was formed, in his capacity as sole director, Austin had appointed himself CEO and President. The Company had never held a meeting of stockholders at any point during its existence, so Austin had continued in those roles. From a technical legal standpoint, Austin was in charge of the Company.

**D.    Waugh Fights Back By Forming Smartcomm, The Association, And PSI.**

Waugh was not about to walk away from PCSI. He needed a way to regain control over the Company or, barring that, a means of extracting the value to which he believed

he was entitled. In furtherance of those goals, he formed a series of entities. Just as he had used Austin as his front man for the Company, Waugh nominally put others in charge of these entities as well.

In December 2007, Waugh formed Smartcomm, LLC with Carole Downs. Waugh met Downs in June 2007 through Match.com. Downs had been a successful real estate broker in Arizona, but the real estate downturn in 2007 hit her business hard, and she was ready for a new project. She had no experience in the wireless license industry and knew nothing about it. Despite her lack of experience, Downs became President of Smartcomm. Waugh served as Vice President. Smartcomm became the new vehicle through which Waugh pursued his activities in the wireless industry.

Waugh and Downs also worked to organize the various investors who had purchased securities from the Company. Their strategy was to blame Austin for the Company's lack of progress, mobilize the investors against him, and then use the investors' anger as the vector for regaining control. Notably, before the Order to Show Cause, there are no indications of any disputes between Waugh and Austin, and neither seems to have been troubled by the absence of any progress by the Company on its business plan. Both appeared content to use the Company as a vehicle for raising money from investors. Only after the FCC issued its Order to Show Cause did Waugh and his new business partner, Downs, begin attacking the Company's lack of progress.

The first investors' organization that Waugh and Downs formed was the Preferred Investors Association (the "Association"). Waugh knew that because of his criminal background and the issues pending before the FCC, he could not be the face of the

organization, so he recruited Michael Judy to serve as its public persona. In 1999, Judy became an investor in the Company after meeting with Waugh and attending a subsequent investor presentation. Waugh and his team convinced Judy about the Company's fantastic prospects, and Judy agreed to make a personally significant investment of $40,000, which he raised by maxing out his credit cards and borrowing from his father. Dkt. 385, at 13–14. Judy was not an expert in the wireless industry; his primary avocation was professional auto racing. His role was that of a passive investor until early 2007, when he became a finder for the Company and was compensated for bringing in other investors. *See id.* at 27–28.

After the Order to Show Cause created a rift between Waugh and Austin, Waugh convinced Judy that Austin was the source of the Company's problems. In November 2008, Judy, Waugh, and other investors in the Company met in San Marcos, California. They agreed to form the Association, and they elected Judy as President.

Judy's tenure as head of the Association and its role as a vehicle for Waugh were both short-lived. Disagreements quickly arose between Waugh's faction and investors associated with Edward Trujillo, who had served as a finder for the Company and brought in many of the individuals who purchased its securities. Judy resigned, and Trujillo became President. The Association eventually came to represent approximately eighty investors who collectively provided approximately $3.1 million in funding to the Company. Trujillo and the Association came to be the principal opponents of Waugh's efforts to regain control over the Company.

Having lost control of the Association, the Waugh faction needed to form a new organization. In January 2009, Judy, Waugh, and various supporters met in Solina Beach, California, where they decided to form PSI. In February 2009, Judy formally created PSI and became its President. Judy admitted at trial in this action that Waugh was instrumental in creating PSI and in developing its strategy. At the same time, he sought to downplay his own connections to Waugh. *See* Dkt. 385, at 35.

The operating agreement of PSI described the entity as having the following business purposes:

> The purpose of [PSI] is to file . . . license applications for . . . markets Sprint Nextel Corp. is vacating . . . *[PSI] also will seek to negotiate a loan transaction with holders of the shares of [PCSI's] Class A Common Stock and the contractual rights to be issued such shares representing a majority of the votes of all of [PCSI's] presently issued and outstanding shares and the shares it has committed to issue.* [PSI] may conduct any other businesses the Management Committee considers appropriate.

Dkt. 511, Ex. 2, at 1–2 (emphasis added). In other words, one of the two identified business purposes of PSI was to gain control of the Company.

## E.    The Judy Litigation

PSI originally approached Austin about a settlement that would involve him transferring control over the Company to PSI. When those efforts failed, PSI decided to initiate litigation. The core strategy was to obtain a court-ordered meeting of stockholders at which Waugh and his allies could replace Austin and retake control of the Company.

PSI itself was not a stockholder in the Company. Judy was, so he served as the plaintiff. PSI's initial role was to fund the litigation and, through Waugh and Downs, to control the overall strategy. PSI did not have any formal agreement with Judy or his

counsel regarding litigation funding. From a legal standpoint, PSI was paying counsels' fees gratuitously in support of its takeover effort.

In June 2009, Judy filed a statutory action for books and records. Among other materials, Judy sought information about the stockholders of the Company and a copy of the Company's stock ledger. Both were critical to PSI's purpose of taking over the Company. Waugh wanted to be able to contact other stockholders, convince them to vote against Austin, and figure out whether he had the votes to win.

In July 2009, Judy brought a statutory action to compel an annual meeting. Since its founding in 1998, the Company had never held an annual meeting. The court-ordered annual meeting was the centerpiece of PSI's strategy to take over the Company. Waugh expected that at the meeting, his faction would replace Austin with a slate consisting of Judy, Downs, and other allies of Waugh.

On the same day that he filed the annual meeting action, Judy filed a plenary action seeking declaratory and injunctive relief regarding the proper composition of the Company's board of directors and Austin's authority—or lack thereof—to take action on behalf of the Company. The plenary action also challenged various actions that Austin had taken as constituting breaches of fiduciary duty. Tactically, the plenary action initially appears to have had two near-term purposes. It would prevent Austin from taking defensive steps that might interfere with Waugh's ability to regain control at a court-ordered meeting, and it would hamper Austin's ability to deal with the FCC and address the Order to Show Cause, which Waugh feared that Austin might use to legitimize his control. In the long run, the plenary action would threaten Austin with personal liability

14

and potentially force a settlement. The court consolidated the three lawsuits (together, the "Judy Litigation").

## F.       The FCC Settlement

Meanwhile, the FCC's proceedings on the Order to Show Cause remained pending. As noted, the Order to Show Cause posed an existential threat to the Company and all of its investors because if the FCC revoked the Company's licenses, then it would have nothing. Consequently, although Austin, Waugh, Judy, Guskey, the members of the Association, the members of PSI, and myriad other Company stakeholders fought vigorously among themselves as to their rights relative to each other, they were united on one point: the FCC should not revoke the Company's licenses.

Waugh had been right to worry that Austin might use the FCC to solidify his position. Effective August 6, 2009, all of the parties to the FCC proceedings—other than Waugh—entered into a settlement agreement (the "FCC Settlement Agreement").[8] Critically for the Company, the FCC agreed that the Company could keep its licenses. For everyone other than Waugh and Bishop, the price the FCC extracted was low. As part of the settlement, the Company, the Licenses Sub, and Austin agreed "[t]o elect or appoint at least one additional member to [the Company's] Board of Directors [and] to recruit a Chief Operating Officer and Chief Financial Officer for" the Company and Licenses Sub, with the identify of those individuals subject to the approval of the FCC.

---

[8] *Pendleton C. Waugh*, FCC 09M-51, EB Docket No. 07-147 (Aug. 6, 2009), *available at* https://transition.fcc.gov/eb/hearings/files/FCC-09M-51.pdf.

*Id.* ¶ 22. The Company and Licenses Sub also agreed to make "a voluntary contribution to the United States Treasurer in the total amount of $100,000." *Id.* ¶ 29. The Company did surrender fifty-three of its licenses, but they were not critical to its two key blocks of licenses.

For Waugh and Bishop, however, there was an additional price. The FCC Settlement Agreement strictly limited their involvement with the Company, including as investors. Paragraph 21 of the FCC Settlement Agreement stated:

> [The Company and Licenses Sub], Charles M. Austin, and Jay R. Bishop each agrees that Pendleton C. Waugh and Jay R. Bishop shall not work for, contract for, consult for, or hold any ownership interest (outright or beneficial) through stocks, warrants, voting trusts, or any other mechanism) in [the Company], [Licenses Sub], any Affiliate of [the Company], and/or any Affiliate of [Licenses Sub].

*Id.* ¶ 21.

Waugh was not a party to the FCC Settlement Agreement, and he immediately challenged its validity in the proceedings before the FCC. In the Judy Litigation, Judy was acting as a front man for Waugh. Consequently, despite the profound benefits of the FCC Settlement Agreement for the Company, Judy challenged it in the Judy Litigation, contending that Austin lacked authority to enter into the agreement. After trial, this court would reject that argument.

## G. Judy's Early Victories

Judy moved for summary judgment in Delaware on various aspects of his claims. By order dated September 29, 2009, as amended on October 13, the court granted summary judgment in Judy's favor on his claim for books and records. The court's order

directed the Company to produce specific categories of books and records, including its "stock ledger and a list of the Company's stockholders." Dkt. 33, ¶ 2(a).

The court also granted summary judgment in favor of Judy on his request for an annual meeting. *Id.* ¶ 4. The order directed the Company hold an annual meeting of stockholders on December 9, 2009, and it appointed Richard L. Renck, Esq., to act as special master for purposes of overseeing the annual meeting. *Id.* ¶ 4(f).

The court even granted preliminary relief in favor of Judy on the claim that Austin could not take action on behalf of the Company. The order stated that "until a board of directors is properly elected in accordance with the foregoing provisions for the meeting of stockholders, Austin shall not hold himself out as constituting the board of directors of the Company." *Id.* ¶ 5.

This was a three-fold victory for Judy and the Waugh faction. The court-ordered annual meeting gave them an opportunity to take control of the Company. The injunction prevented Austin from taking defensive action that might interfere with their efforts to gain control at the meeting. At the time, the ruling on the stock ledger and related information seemed the least significant of the three, but that would soon change.

## H.    The PSI Loan Gambit

With his three-fold victory in hand, Judy provided investors in the Company with an update through a letter dated October 12, 2009. Dkt. 511, Ex. 5 (the "October 12 Letter"). The October 12 Letter included a description of recent events at the Company, Judy's efforts in the litigation, and what Judy expected would happen at the annual meeting. After presiding over this litigation for multiple years, during which more and

more of the full story has been revealed, I am now struck by the degree to which the October 12 Letter (i) concealed Waugh's involvement while (ii) characterizing events in a manner beneficial to Waugh's interests, particularly as to events before the FCC. For example, the October 12 letter stated that the FCC Settlement Agreement "threatens to impair the Company's [Economic Area] authorizations and cancel many of its site-based licenses." *Id.* at 3. In fact, the settlement saved the key blocks of licenses that the Company needed to have any prospect of success.

In the October 12 Letter, Judy described a plan for PSI to loan money to the Company. The money would be used to pay the legal fees incurred in the Judy Litigation and also "legal fees to be incurred with respect to several FCC regulatory matters." *Id.* at 4. The loan would be funded by a private offering of Class C Units in PSI. The letter failed to mention that the consideration sought from the Company for the loan would be shares of Company stock, such that the plan would result in PSI (and thus Waugh) regaining control of the Company. The October 12 Letter encouraged stockholders to appoint PSI as their proxy for the scheduled annual meeting on December 9, 2009.

Consistent with the October 12 Letter, PSI in fact prepared and distributed an offering memorandum to raise money from third party investors. The offering memorandum explained that PSI would use the funds it raised to (i) pay $3 million for "applications for licenses" from Smartcomm License Services, LLC, an affiliate of Smartcomm, (ii) pay $750,000 for equity in Stargate Management, LLC, an affiliate of Smartcomm, and (iii) loan the Company $2.5 million for a period of two years (the "PSI Loan"). In return for the PSI Loan, PSI expected to receive interest at a rate of 11% per

18

annum plus warrants to purchase 750,000 shares of common stock of the Company. The PSI Loan was an attempt by Waugh to re-establish his connection to the Company, but with the legal risk mitigated by (i) the use of a loan with warrant coverage and (ii) the channeling of the loan through PSI.

To his credit, Austin refused to negotiate with PSI over the PSI Loan. That aspect of PSI's business plan never got off the ground. The PSI Loan was consistent with Waugh's overall strategy to re-gain control over the Company and extract value from it.

## I. The Judy Litigation Becomes Significantly More Complex.

After the court's rulings on September 29, 2009, Waugh and his allies thought they were on their way to a court-ordered meeting on December 9. But what seemed to have been the most straightforward of the court's rulings—the order compelling the Company to produce its list of stockholders—served as the catalyst for a far more complicated proceeding. Put simply, the Company's records were such a mess that Austin could not provide the required stockholder materials or stock ledger.

After the Company failed to meet the court-ordered deadline for producing these records, Judy sought the appointment of a receiver who would take control of the Company for the limited purpose of producing them. The motion was briefed, and on December 23, 2009, the court appointed Renck to act as receiver for the Company (the "Receiver"). Renck previously had been appointed to serve as special master for the purpose of holding the court-ordered meeting of stockholders, so this was a natural enlargement of his duties. The formal order was entered on December 23. The order

19

charged the Receiver with identifying the Company's stockholders, determining who could vote at the annual meeting, and then convening and conducting the meeting.

The Judy Litigation also became significantly more complex in December 2009 because the court permitted the Association to intervene. Trujillo had perceived Waugh's strategy of using a court-ordered meeting to regain control of the Company. He also perceived that Waugh was using Judy as a front man to hide his involvement.

When the Association sought to intervene, PSI moved to intervene as well. The court denied PSI's motion. Dkt. 120. The ruling noted "important differences between [the Association] and PSI," including that PSI was formed in part to pursue business opportunities that would bring it in competition with the Company. *Id.* at 2. The court concluded that PSI was "a for-profit operation that seeks to intervene in a matter in which it has no direct interest." *Id.*

## J. The Receiver's Report

On March 5, 2010, the Receiver filed a thorough, lengthy, and detailed report, in which he made recommendations regarding the identity of the Company's stockholders and their holdings. The Receiver also identified serious problems with the Company's capital structure.

Several of the Receiver's recommendations displeased Waugh and his allies. One of the more significant issues that the Receiver addressed was the number of shares held by the four founders: Waugh, Austin, Bishop, and Guskey. Austin claimed to own 800,000 shares of the Company's stock, making him the Company's largest single stockholder. Waugh contended that he had been issued the same number of shares, but

20

that to avoid problems with the FCC, the four founders had agreed to place Waugh's

shares in a trust controlled by Waugh's friend, Raymond Hebrank (the "Hebrank Trust").

The Receiver, however, recommended that the court find that the Hebrank Trust was *not*

entitled to 800,000 shares. The Receiver also recommended the rejection of a claim by

Alejandro Calderon, a supporter of Waugh's, to own 300,000 shares.

Waugh responded to the report by calling upon his allies to file and litigate

lawsuits and objections. In an email dated March 5, 2010, to Downs, Judy, and forty

other persons, he wrote:

> So now I hire an attorney and together with Raymond Hebrank file a civil
> lawsuit against [the Company] and the Receiver for specific performance of
> Mr. Austin's verbal agreement to issue the Raymond Hebrank Voting Trust
> 800,000 shares of Common Stock. I also will be seeking additional
> Common Stock Purchase Warrants and compensatory and punitive
> damages. I would think that Alejandro Calderon, Angel Benitez, Michael
> Judy and other would file similar lawsuits. I would think that Mr. Judy and
> other Preferred shareholders and note and warrant holders also now would
> pursue litigation to enforce their claims for the issuance of shares, warrants
> and/or notes and may seek to recover monies owed or promised.

Dkt. 511, Ex. 6.

In April 2010, just as Waugh had indicated, the Hebrank Trust filed a plenary

action to obtain the shares to which Waugh believed he was entitled.[9] More importantly

---

[9] *See* Complaint, *Hebrank v. Preferred Commc'ns Sys., Inc.*, C.A. No. 5434-VCL (Del. Ch. Apr. 23, 2010). This court dismissed the Hebrank Trust's claim, after which the trust appealed. *Hebrank,* C.A No. 5434-VCL *Id.* at 34–37 (June 20, 2011) (TRANSCRIPT). While the appeal was pending, Waugh passed away, and the parties dismissed the appeal by stipulation.

for present purposes, Waugh's allies filed an avalanche of objections to the Receiver's report. PSI funded the objectors' legal fees.[10]

Many of the Receiver's conclusions turned on assessments of incomplete and conflicting corporate records, and the objections made clear that a trial would be needed to resolve the persistent disputes about who owned stock and could vote at the court-ordered meeting. The parties engaged in litigation over the objections in anticipation of a hearing to take place in July 2010, but the process faltered when the Receiver's fees went unpaid. By letter dated September 7, 2010, the court confirmed that it would not hold a hearing until the Receiver's fees were paid. Trial eventually was rescheduled for February 2011, then deferred again to allow for mediation. After several additional continuances, trial ultimately took place in December 2011.

After trial, the court expanded the Receiver's authority and issued several orders and judgments. Among other things, the court's post-trial orders and rulings invalidated the attempted reorganization from 2007, adopted various settlements recommended by the Receiver, and approved a final stock list for the Company. The court directed the Receiver to "schedule a Court-ordered meeting of stockholders for the election of a new board of directors, set the record date for the meeting, give notice of the meeting,

---

[10] *See, e.g.*, Dkt. 529, Ex. 5, at 5 (objective to provide PCSI's investors a fair return on their investments "at no additional cost to them."); *id.*, Ex. 7, at 2 ("offer for Legal Representation is **FREE OF COST** to you" because "PSI is actively participating in other wireless communications investment opportunities that are generating the funds to finance this legal effort on behalf of all PCSI investors") (emphasis in original); *id.*, Ex. 8, at 1 ("You will not be billed or expected to pay any portion of the attorneys' fees"); *id.*, Ex. 60, at 120–26.

convene and conduct the meeting, and determine those members of the board of directors who have been elected and qualified." Dkt. 417, ¶ 14.

## K.    Judy's Original Fee Petition

After obtaining the relief that this court awarded after trial, Judy sought, on behalf of PSI, an award of fees and expenses, which he asked to have granted 200,000 shares of stock. Dkt. 511, Ex. 16, at 62. The shares would represent 19.4% of the total outstanding equity. With the benefit of hindsight, it seems clear that PSI wanted the shares so it could deploy them in connection with the upcoming meeting of stockholders so as to help its faction gain control and because the shares would constitute a significant percentage of the economic value of the Company.

At the time, I rejected Judy's share-based fee petition because, as a threshold matter, I had no way to determine how much value would be conferred by 200,000 shares. The Company's future was, at that point, still contingent and highly uncertain. The Company had no operations and its only meaningful assets were the PR/VI Licenses and the CONUS Licenses. Those licenses might have turned out to have great value, or they might have turned out to be worthless. Among other reasons, there were still questions after trial as to what action the FCC would take and whether the FCC Settlement Agreement would remain in effect.

Given this uncertainty, I declined to award any shares to PSI, stating that the benefit conferred by the Judy Litigation could well be "nonexistent or entirely speculative." *Id.* at 109. Without deciding the matter, I held out the possibility that there might be some basis for a fee award in the future, stating that "[i]t may be that at some

23

point, things are sufficiently certain so that one could either craft a share-based award or the company would be in a position to pay an award out of real money." *Id*.

**L.      The 2013 Annual Meeting**

After this court's rulings, a proxy contest ensued in which PSI and the Association each sought to elect candidates to the board at the court-ordered meeting. PSI put forth a slate comprising Judy, Downs, Barclay Knapp, Roman Kikta, and Michael Scott. The Association put forth its own slate. The election was hotly contested.

The annual meeting was held on January 23, 2013. Out of 172 separate stockholdings listed on the stock list, 159 holdings were voted either in person or by proxy. The vote count showed that PSI's nominees narrowly prevailed.

The Association challenged the outcome. Among other things, the Association argued that PSI and its principals had misrepresented their relationship with Bart Caso, an individual who had been charged with fraud while raising money for PSI. *See* Dkt. 452. By order dated March 18, 2013, I determined that PSI's nominees had been validly elected (the "PSI Directors"). I overruled the Association's objections, including its challenge based on PSI's relationship with Caso. Dkt. 456. In the fee application, PSI has sought to recover amounts incurred for lawyers for Caso and for the fundraising efforts in which Caso was involved.

**M.      The Sprint Transaction**

In April 2013, the PSI Directors began taking action on behalf of the Company. They appointed Knapp as President and CEO and approved a compensation package for him that included a $450,000 salary, an incentive bonus equal to 100% of his salary, and

24

stock options. Shortly after becoming CEO, Knapp co-founded M2M Spectrum Networks with Downs. Dkt. 511, Ex. 59, at 25–26.

On December 20, 2013, the Company reached an agreement to sell the CONUS Licenses to Sprint for $60 million (the "Sprint Transaction"). The CONUS Licenses represented roughly 70% of the Company's fixed assets. The Company still possessed the PR/VI Licenses.

In June 2014, the Sprint Transaction closed. After receiving the $60 million in transaction proceeds, the PSI Directors authorized various payments by the Company. They included compensation payments to the directors and a special bonus to Knapp of $315,000.

## N.    The Next Falling Out

In 2013 and 2014, tensions began to build between Downs and Judy. One source of tension was Downs' demand that PSI pay Smartcomm for amounts due on a promissory note that PSI issued with a face amount of $3.65 million (the "Promissory Note"). PSI contends that the note memorializes funds it received from Smartcomm and used predominantly to pay legal fees for the various law firms involved in the Judy Litigation and in proceedings before the FCC. Downs has claimed that she provided the bulk of the money that Smartcomm loaned to PSI from her personal funds.

PSI's Management Committee did not immediately agree to provide the funds that Smartcomm was seeking, which infuriated Downs. The Management Committee, led by Judy, conducted an audit regarding "discrepancies, if any, in the Smartcomm loan's [sic] which may affect the remaining balance owed." Dkt. 511, Ex. 24; *see also id.*, Ex. 28.

25

In July 2014, Downs wrote to PSI's members and called for an election of new managers. At a meeting of members in September 2014, Judy and two other managers resigned in favor of a new group of managers that included a substantial new investor named David Mellish. *See* Dkt. 511, Ex. 36. It appears that Downs convinced Mellish and others that because PSI had helped fund the Judy Litigation, the Company owed millions of dollars to PSI, which PSI then could use to pay Smartcomm and M2M. *See* Dkt. 529, Ex. 58, at 172–73.

**O.     The Company Makes A Partial Payment To PSI.**

In September 2014, the Company began negotiating with PSI over amounts that PSI claimed were due from the Company. In November, Downs and Knapp signed an agreement assigning the Promissory Note from Smartcomm to the Company in return for a payment to Smartcomm equal to the face value of the amount due, or $3.48 million. *See* Dkt. 511, Ex. 42. At the time, PSI was a cash-poor entity with less than $400,000 in the bank. *See id.*, Ex. 41. The assignment meant that Smartcomm and Downs replaced an effectively unrecoverable debt claim against PSI with $3.48 million in cash.

In June 2015, Knapp and Mellish signed a settlement agreement in which the Company purportedly agreed to pay the legal expenses that PSI incurred in the Judy Litigation. The consideration consisted of (i) forgiving the Promissory Note, (ii) making a payment of $658,859.36, and (iii) agreeing that PSI could file a fee application with the court (the "PSI Settlement Agreement").

**P.** **The Fee Application**

This court issued its final decision on the merits in this matter on March 26, 2013. Dkt. 460. The Delaware Supreme Court affirmed this court's post-trial ruling and issued its mandate on May 28, 2013. Dkt. 462. Two-and-a-half years later, on December 21, 2015, PSI moved to re-open the case and intervene so it could file a fee application. Dkt. 465. I granted the motion so that I could consider PSI's arguments. Dkt. 467. PSI filed its operative fee application on March 2, 2016. Dkt. 474. The Association took the lead in opposing the fee petition.

In its primary argument, PSI contends that it should receive a fee award based on the value of the Company's wireless licenses. PSI starts with the $60 million that the Company obtained in the Sprint Transaction for the CONUS License and represents that the Company paid $23,878,758.45 in taxes on that amount, for an effective tax rate of 40%.[11] PSI claims that the value of the PR/VI Licenses is between $40-$60 million. *Id.* at 1, 21. PSI contends it should receive one third of the after-tax value of the benefit. The resulting calculation yields an after-tax benefit of $60 million and an award of $20 million.

PSI attempts to bolster its claim to this amount by citing the following additional benefits:

> [T]he funding of the litigation prevented the improper dilution of PCSI's common stockholders' interest as 800,000 common shares were cancelled

---

[11] *Id.* at 1, 10 n.3. PSI claims the effective tax rate is 39%. My calculation yields 39.7%, so I have rounded up rather than down.

through the litigation. Moreover, numerous other stockholders were properly permitted to convert into common stock and receive distributions from the monetization of the licenses. PSI also funded a search for a Chief Executive Officer of PCSI. This resulted in the employment of [Knapp], an experienced professional in the industry.

*Id.* at 1–2. PSI does not seek to value these benefits separately, only to use them to support its request for an award of approximately $20 million.

Alternatively, PSI seeks an award of $4,958,056.43, representing expenses that PSI claims to have incurred. PSI contends it actually incurred $8,257,717.52 in expenses, but it has reduced this amount to account for the value it received in the PSI Settlement Agreement. PSI has supported this amount with a difficult-to-read chart and an affidavit from Downs. *See id.* at 12. Although the court has considered the Downs affidavit, she admitted in deposition that she did not prepare the chart, did not have personal knowledge regarding a number of entries, and could not explain why certain figures were included. *See* Dkt. 529, Ex. 60, at 81, 85, 262.

PSI's chart includes four broad categories. The first collects $4,198,618.40 in expenses under the heading of "LEGAL EXPENSES." Dkt. 479, at 12. Of this amount, perhaps $2 million could be attributed to Judy's litigation efforts. PSI's chart of expenses reflects that it paid $1,052,087.78 to Potter, Anderson & Corroon LLP, Judy's first counsel, and $1,014,395.04 to Duane Morris LLP, Judy's successor counsel. The balance, or approximately another $2 million, went to fund lawyers for different purposes. It is not possible to determine precisely which lawyers did what, because PSI did not provide that information, but many of the law firms listed on PSI's chart represented the myriad of Waugh allies who intervened in this action after Waugh decided to attempt to overwhelm

28

Austin and the Receiver with objections. Other law firms represented PSI and pursued Waugh's interests in proceedings before the FCC. Still other firms advised PSI on its financing efforts, including on securities law issues. PSI's list of "LEGAL EXPENSES" also includes what are obviously not legal expenses, such as $108,602.25 for "Equicap, Spencer Stuart, Angel Benitez," which apparently includes some degree of executive search expenses, and $1,812.50 for "VirtualCFO." *Id.* at 12.

The second category on PSI's chart is titled "NOTE 4 EXPENSES" and totals $292.520.31. *Id.* It has three subcategories: (i) "Admin Fees" of $147,247.51, (ii) "Commissions" of $79,679.39, and (iii) "Interest Expense" of $65,593.42. These items appear to be fees and expenses that PSI incurred under the Promissory Note that it issued to Smartcomm. Although the PSI Settlement Agreement extinguished the principal, PSI is still seeking to recover these expenses. Downs averred in her affidavit that the "Admin Fee" was for monthly fees charged by Smartcomm to PSI for administrative, back office, management, and consulting services. Dkt. 474, Downs Aff. ¶ 12. It is not clear how the amounts were determined, or what specific services were provided. PSI did not address the "Commissions" or "Interest Expense."[12]

The third category is titled "MGMT/ACCT/CONSULTING EXPENSES" and aggregates categories of expenses totaling $2,259,548.53. This category includes virtually every business expense that PSI incurred to manage its operations over a period

---

[12] The "Commissions" heading under the "NOTE 4 EXPENSES" is a different category than the "Commissions" heading under "MGMT/ACCT/CONSULTING EXPENSES," which Downs did describe in her affidavit. *See Id.* ¶ 25.

of eight years. *See* Dkt. 529, Ex. 60, at 143 (Downs: Q: "It was basically everything that – all the conduct that PSI did as a business, correct?" A: "For the most part, yes."). The items include the following:

- $945,000 in "Management Fees" that were paid to members of PSI's Management Committee.

- $608,224.90 in "Smartcomm Agent Services," comprising commissions paid to Smartcomm for locating investors for PSI.

- $354,000 under the heading "Executive Search," which Downs said was incurred to find a new CEO for the Company.

- $172,481.66 in "Commissions" that PSI paid to finders to locate investors for PSI, which Downs described as a subcommittee of PSI's management committee.

- $73,000 in compensation paid to a "Delaware Subcommittee."

- $52,926.25 in "Travel Expenses" that were incurred by PSI officers and employees in the course of raising funds for PSI.

- $18,394.20 for a CPA.

- $2,097.77 in "Office Supplies."

- $1,687.50 for bookkeeping services.

- $461 for "Bank Service Charges."

- $99.99 in "Advertising and Promotion," which covered the cost of photographing Judy so he could appear in advertisements for PSI investors.

The final category is interest. PSI claims to be entitled to $780,551.75 in interest on the amounts identified as "LEGAL EXPENSES," plus $726,478.52 in interest for the amounts identified as "MGMT/ACCT/CONSULTING EXPENSES." PSI calculated interest at "Prime + 5%," without disclosing what rate it used as the "Prime Rate."

## II.     LEGAL ANALYSIS

"'[L]itigants in Delaware are generally responsible for paying their own counsel fees,' absent special circumstances or a contractual or statutory right to receive fees." *Scion Breckinridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686 (Del. 2013) (quoting *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 421 (Del. 1994)). "[A] Chancellor or Vice Chancellor, 'under his equitable powers, has latitude to shift attorneys' fees.'" *Id.* (quoting *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1222 (Del. 2012)). One circumstance where this power may be exercised is when the litigation creates a common benefit. *Id.* at 686–87. The exception is "founded on the equitable principle that those who have profited from litigation should share its costs." *Goodrich v. E.F. Hutton Gp., Inc*, 681 A.2d 1039, 1044 (Del. 1996).

Under the common benefit doctrine, a litigant may receive an award of attorneys' fees if (i) the action was meritorious when filed, (ii) an ascertainable group received a substantial benefit, and (iii) a causal connection existed between the litigation and the benefit. *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006). The benefit may take the form of either a tangible, monetary benefit (*i.e.*, the "common fund" exception), or an intangible benefit to an entity, such as supplemental disclosures or changes in corporate governance (*i.e.*, the "corporate benefit" exception). *Id.* at 1090.

The power to award fees for conferring a common benefit "is a flexible one based on the historic power of the Court of Chancery to do equity in particular situations." *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1166 (Del. 1989). The equitable nature of the remedy means that even if a litigant technically satisfies the requirements, the court

may still decline to award fees and expenses. When declining to award fees and expenses to a litigant who otherwise meets the requirements of the common benefit doctrine, Delaware courts have considered the potential for the litigant's interests to diverge from those that the litigant purported to benefit or represent.[13] The decisions have also evaluated whether a fee award would serve public policy goals, such as incentivizing plaintiffs' counsel to police fiduciary wrongdoing.[14]

If the court determines that a fee award is warranted, then the court crafts an award using factors that the Delaware Supreme Court identified in *Sugarland Industries, Inc. v. Thomas,* 420 A.2d 142 (Del.1980). "In determining the size of an award of attorney's fees, courts assign the greatest weight to the benefit achieved by the litigation." *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018, at *8 (Del. Ch. Aug. 30, 2007). Secondary factors include the complexity of the litigation, the standing and skill of counsel, and the contingent nature of the fee arrangement together with the level of contingency risk actually involved in the case. *Gatz v. Ponsoldt*, 2009 WL 1743760, at *3 (Del. Ch. June 12, 2009). In this case, the court need not reach the question of the amount of a fee award, because none is warranted.

---

[13] *See, e.g.*, *In re Orchard Enter., Inc. S'holder Litig.*, 2014 WL 4181912, at *10 (Del. Ch. Aug. 22, 2014); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 789 A.2d 1216, 1227 (Del. Ch. 2001), *aff'd sub nom. Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959 (Del. 2003); *In re Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *9 (Del. Ch. Nov. 27, 1990).

[14] *See, e.g.*, *Orchard*, 2014 WL 4181912, at *11; *Mentor Graphics*, 789 A.2d at 1230–31; *Dunkin' Donuts*, 1990 WL 189120, at *10.

**A.      PSI Lacks Standing Because It Is Not The Plaintiff Or Its Counsel.**

PSI's fee application largely glosses over the question of whether PSI has standing to seek a fee award given its role in the Judy Litigation. PSI was neither the plaintiff nor plaintiff's counsel. PSI was a source of financing for the litigation, which it provided gratuitously without any formal agreement with Judy. In my view, PSI cannot seek a fee award because of the nature of its non-role in the Judy Litigation.

Delaware precedent universally assumes that only a litigant or its counsel has standing to seek a fee award.[15] PSI has not cited any precedent suggesting that a non-party can seek a fee award. In its reply brief, PSI concedes that there is no precedent for awarding a fee to a non-party. *See* Dkt. 529, at 12–13.

In lieu of authority, PSI offers a policy argument. According to PSI, awarding fees to a non-party that financed litigation is no different than awarding fees to a figurehead plaintiff who holds a nominal amount of stock. PSI contends that in both cases, fees should be awarded so that those who receive the benefit are obligated to pay for it.

---

[15] *See, e.g.*, *Dover Historical Soc'y*, 902 A.2d at 1089 ("A *litigant* may receive an award of attorney's fees.") (emphasis added); *Tandycrafts,* 562 A.2d at 1166 ("[T]he critical inquiry is not the status of *the plaintiff*, but the nature of the corporate or class benefit.") (emphasis added); *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980) ("*Plaintiffs' counsel* would be entitled to attorneys' fees and costs where [the elements of the common benefit rule are met.]") (emphasis added); *Chrysler Corp. v. Dann,* 223 A.2d 384, 386 (Del. 1966) ("The rules governing the award of fees and expenses *to a litigant for payment of his counsel* are well established . . . [W]hen the litigation results in benefit to all members of a class, *the successful litigant* is entitled to an allowance for counsel fees.") (emphases added); *Rosenthal v. Burry Biscuit Corp.*, 209 A.2d 459, 460 (Del. Ch. 1948) ("In [a common benefit case] *the attorney for a successful plaintiff* would in the normal course of events become entitled to a fee.") (emphasis added).

33

PSI's policy-based argument is too simplistic. "Not everyone who contributes to a benefit gets a fee award." *Orchard*, 2014 WL 4181912, at *9. The common benefit doctrine does not operate as a generalized mechanism for achieving redistributive justice. It is a tool for overcoming the collective action problems that would otherwise prevent socially beneficial litigation from being pursued. *See Raul v. Astoria Fin. Corp.*, 2014 WL 2795312, at *6 (Del. Ch. June 20, 2014); *Bird v. Lida, Inc.*, 681 A.2d 399, 402–03 (Del. Ch. 1996) (Allen, C.). The tool works by providing an incentive for those who actually pursue the litigation, namely the litigant and the litigant's counsel.

Litigation financiers do not need the common benefit doctrine to give them an incentive to finance litigation. They provide financing for the same reason that any lender loans money: to obtain a risk-adjusted return under the terms of a bargained-for agreement. PSI could have entered into an agreement with Judy that would have contemplated some form of repayment, including potentially a repayment that would be funded by a court-ordered fee award. Instead, PSI chose not to document its arrangement with Judy and to provide its financial backing as a gratuitous volunteer. Under the circumstances, PSI cannot now seek an equitable award of attorneys' fees and expenses under the common benefit doctrine.

## B. PSI Was Trying To Take Over The Company.

PSI lacks standing to seek a fee award under the common benefit doctrine for a second reason: PSI funded the Judy Litigation as part of an effort to take over the Company.

34

Consistent with the purpose of the common benefit doctrine, a plaintiff lacks standing to seek and obtain a fee award if the litigant's primary purpose was to advance its personal interests. One recurring scenario is when a party files litigation in support of a takeover effort, where the bidder's primary motivation is to achieve its personal goal of acquiring the company and any common benefit is incidental. *See Mentor Graphics,* 789 A.2d at 1232.

In this case, the record shows that PSI funded the Judy Litigation as part of an effort by Waugh and his allies to take control of the Company. Before the FCC issued its Order to Show Cause, Austin had been acting as a figurehead for Waugh. The Order to Show Cause, however, drove a wedge between Austin and Waugh and caused Austin to assert the authority that he nominally held. Waugh and Downs formed PSI with Judy as part of a plan to regain control of the Company. One of the business purposes identified in PSI's LLC agreement was "to negotiate a loan transaction with the holders of the shares of [the Company's] Class A Common Stock *and the contractual rights to be issued such shares representing a majority of the votes.*" Dkt. 511, Ex. 2, at 2–3 (emphasis added). During the litigation, Waugh strategized with lawyers on how to effectuate the "assignment and/or transfer of control of PCSI." *Id.*, Ex. 10. After Waugh died, Downs continued directing the litigation. *See id.*, Ex. 26. Like Waugh, she attempted to hide her involvement, but she nevertheless funded the bulk of the Judy Litigation with the expectation that the lawsuit would result in her gaining control of the Company. *See id.*, Ex. 49, at 49. In the short-term, the effort worked, with Downs achieving the control she sought through the election of the PSI Nominees. *See, e.g.*, *id.*,

35

Ex. 48, at 48–49 (Knapp: "Q: Has PCSI ever done anything that Ms. Downs didn't want to happen? A: No.").

PSI funded the Judy Litigation as part of its takeover effort. Any benefits that the Judy Litigation produced for the Company and its other stockholders were incidental. In reality, the litigation was the means by which PSI sought to achieve control. Under the circumstances, PSI cannot seek a fee award for the Judy Litigation.

## C.     PSI Cannot Claim A Benefit Based On Value Of The Licenses.

Assuming for the sake of argument that PSI had standing to seek a fee award, PSI has failed to justify basing the fee award on the value of the Company's licenses. "[W]hat is relevant is the benefit is *achieved by the litigation*, not simply a benefit that, *post hoc ergo proctor hoc*, is conferred after the litigation commences." *In re Anderson Clayton S'holders Litig.*, 1988 WL 97480, at *2 (Del. Ch. Sept. 19, 1988) (Allen, C.). The litigation need not be the sole or direct cause of the claimed benefit, but there must be a sufficient causal connection to warrant a fee award. *See Dunkin' Donuts*, 1990 WL 189120, at *6. Although a litigant is entitled to a rebuttable presumption of causation if defendants take action that moots a plaintiffs' claim, that presumption does not come into play outside of the mootness context.[16] Here, the question is whether PSI can claim credit

_____

[16] *See, e.g.*, *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012) ("Under the 'mootness rule,' when a defendant took an action after the suit was filed that mooted a claim, there is a rebuttable presumption that the suit and the benefit were causally related.") (citing *McDonnell Douglas Corp. v. Palley*, 310 A.2d 635, 637 (Del. 1973)); *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1080 (Del. 1997) ("Where, as here, a corporate defendant, after a complaint is filed, takes action that renders the claims asserted in the complaint moot, Delaware law imposes on it the burden

for benefits that the litigation did not generate as a remedy.[17] In this context, PSI has the burden of establishing the necessary causal link.

PSI argues that causation exists because "but-for PSI and the Litigation, the FCC would have determined PCSI was in breach of the [FCC Settlement Agreement]," which would have resulted in the Company forfeiting its licenses. Dkt. 474, at 17. In reality, through the Judy Litigation, PSI sought to invalidate the FCC Settlement Agreement. Had it succeeded, the Company's licenses would have been jeopardized. Putting aside PSI's change of heart, PSI's argument fails because the Company could have complied with the FCC Settlement Agreement by other means. It is entirely possible that without the Judy Litigation, Austin would have taken steps to fulfill the requirements of the agreement he negotiated.

Equally problematic is the converse contention that the Judy Litigation ensured compliance with the FCC Settlement Agreement. The Judy Litigation resulted in an order requiring an annual meeting. It was then up to the new board of directors to take steps to comply with the FCC Settlement Agreement. The board's actions were an intervening

---

of persuasion to show that no causal connection existed."); *Allied Artists*, 413 A.2d at 880 ("[T]he party who takes the action that cures the alleged wrong to the corporation's benefit *and thereby moots or settles the lawsuit* should bear the burden.") (emphasis added).

[17] *See, e.g.*, *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 293 (Del. 2002) ("[T]he mere pendency of litigation alone does not establish the causal connection."); *Waterside P'rs v. C. Brewer & Co.*, 739 A.2d 768, 770 (Del. 2000) ("[T]he establishment of a nexus between the litigation, itself, and the claimed corporate benefit is a *sine qua non*.").

cause that breaks the chain between the Judy Litigation and compliance with the FCC Settlement Agreement. *Cf. Waterside P'rs v. C. Brewer & Co.*, 1999 WL 135245, at \*2 (Del. Ch. 1999) (finding no causation between litigation and a resulting corporate benefit when an intervening shareholder vote mooted the litigation), *aff'd*, 739 A.2d 768.

Even more extreme are PSI's claims that the Judy Litigation caused (i) the monetization of the CONUS Licenses through the Sprint Transaction and (ii) an as-yet hypothetical monetization of the PR/VI Licenses. The Judy Litigation did not cause the Sprint Transaction. That was the result of many factors, including action by the Company's directors and its management. As for the PR/VI Licenses, the Judy Litigation obviously has not brought about a transaction that has not occurred yet.

Once again, the converse is equally true. Assume for the sake of argument that, in hindsight, the Judy Litigation was a but-for cause of the Sprint Transaction and will be a but-for cause of some future transaction. That assumption makes the Judy Litigation one cause of those events, but not the *sole* cause of those events. Many other factors also were (and will be) but-for causes, including the founding of the Company, Austin's initial efforts to obtain the licenses, the financing received from various investors, *etc*. PSI has briefed its fee application as if it were the sole cause of the Sprint Transaction and a still hypothetical future transaction. Accepting that the Judy Litigation played some role in helping to resolve problems with the Company's governance structure and was a step along the path to future success, it was not a sufficiently related cause to support the type of sole-credit award that PSI is seeking.

Reduced to its essence, PSI's theory of causation is the proverbial horseshoe nail that lost the kingdom.[18] In PSI's version of the story, the Judy Litigation caused the annual meeting where the stockholders voted to elect the board that complied with the FCC Settlement and appointed the CEO who negotiated with Sprint and obtained the Sprint Transaction. As with the proverb, this attenuated theory of causation is too extreme. An insufficient nexus exists between the Judy Litigation and the Sprint Transaction or some future transaction to support an award based on the proceeds of those events.

### D.    Quantum Meruit

As its fall-back position, PSI claims it should recover what it spent under a *quantum meruit* theory. A claim of *quantum meruit* is "a quasi-contract claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the

---

[18]    For want of a nail, the shoe was lost.
For want of a shoe, the horse was lost.
For want of a horse, the rider was lost.
For want of a rider, the message was lost.
For want of a message, the battle was lost.
For want of a battle, the kingdom was lost.
And all for the want of a horseshoe nail.

*Oxford Dictionary of Nursery Rhymes* 324 (Peter Opie & Iona Opie eds., 1951).

recipient should have known that the party expected to be paid." [19] On these facts, neither element is met.

First, the record belies the claim that PSI advanced funds with the expectation that anyone would pay for them. PSI did not document any type of repayment scheme with Judy, nor did PSI contract with Judy about the possibility of Judy applying for a fee award. Instead, as discussed above, PSI voluntarily paid the amounts necessary to finance the Judy Litigation as part of its effort to take control of the Company.

Second, neither PCSI nor its stockholders had any reason to believe that PSI expected to be paid for financing the Judy Litigation. PSI attempted to negotiate a loan with the Company to fund various attorneys' fees and expenses, and the Company (through Austin) refused. Later, after the Receiver issued his initial recommendation, Waugh and PSI decided to foment litigation by encouraging and financing objections to the Receiver's report. When inducing this litigation, PSI represented that the investors would *not* bear any cost:

> This offer for Legal Representation is **FREE OF COST TO YOU.** The [PSI] Members comprised of 17 PCSI Investors have promoted a plan since January of 2009 to assure every PCSI Investor the right and the opportunity to realize the full benefit of their investment in PCSI at no further cost to them. PSI is actively participating in other wireless communication

---

[19] *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004) (internal citation omitted). PSI separately re-frames its *quantum meruit* theory as a claim to be reimbursed under the guise of unjust enrichment. *See* Dkt. 479, at 25–27. I do not believe that unjust enrichment provides an independent basis for a fee award. Both the common benefit doctrine and the concept of *quantum meruit* are designed to force the parties who received benefits to pay for the value of the benefits they obtained. Both encompass the terrain that unjust enrichment might otherwise occupy.

40

investment opportunities that are generating the funds to finance this legal effort on behalf of all PCSI Investors.

Dkt. 529, Ex. 7, at 2. In other communications, PSI communicated the same message, namely that the Company and its investors would not be expected to repay PSI.[20]

Even assuming for the sake of argument that PSI had some ability to recovery its expenses under a *quantum meruit* theory, under no circumstances would PSI be entitled to recover (i) the legal fees and expenses it incurred to finance the objections brought by Waugh's allies to pursue their personal claims against PCSI, (ii) the legal fees and expenses that PSI incurred for proceedings before the FCC, or (iii) the ordinary business expenses that PSI incurred during its eight years of existence. The amount of theoretically recoverable expenses in the Judy Litigation ends up being less than the amount of value that PSI says it already has received from the Company, leaving no room for any further award.

The first category of expenses consists of at least $156,927.48 in legal fees paid to finance the avalanche of shareholder objections to the Receiver's report.[21] These objections conferred no benefit on the Company. Instead, the objectors sought to pursue

---

[20] *See, e.g.*, *id.*, Ex. 5, at 5 ("The PSI Management Committee's collective . . . objective is to provide the opportunity for [Company] investors to realize that goal at no additional cost to them."); *id.*, Ex. 8, at 1 ("You will not be billed or expected to pay any portion of the attorneys' fees. That cost has been assumed by PSI.").

[21] *See* Dkt. 530, at 35, 75. It is impossible to determine with certainty whether more of the claimed fees were incurred to fund stockholder objections, as PSI's counsel at oral argument could not explain the role played by several of the listed law firms.

personal claims against the Company, which complicated and prolonged these proceedings.

The second category of expenses consists of at least $192,555.63 in legal fees incurred in other proceedings.[22] Over half of this total was spent defending Caso against criminal charges. For the remaining expenses in this category, PSI counsel either could not establish their connection to the Judy Litigation,[23] or they furthered a purpose inimical to the Company's interests.[24]

The third category of expenses includes a variety of types of overhead and other business expenses that PSI has sought to recover, such as compensation for PSI's management committee, commissions paid to Smartcomm for locating investors for PSI, and "Administrative Fees" paid to Smartcomm. Dkt. 474, Downs Aff. ¶¶ 21, 32, 38. PSI's only justification for including these expenses is a syllogism: (i) PSI's *raison d'etre* was the pursuit of the Judy Litigation; (ii) but-for PSI, the Company would not exist; (iii) therefore, the Company must repay PSI for its costs of doing business.

The fallacy of the second step in PSI's syllogism has already been addressed: it is not true that but for PSI, the Company would not exist. The error in the third step is that

---

[22] *See id.* at 34–35, 36, 60, 75–76.

[23] *Id.* at 36–37, 60–61.

[24] *See, e.g.*, *id.* at 61–62 (counsel retained to negotiate with FCC in connection with PSI's efforts to attack the FCC Settlement Agreement).

business expenses are not within the scope of the corporate benefit doctrine.[25] The first step fails as well. This court already held when denying PSI's application to intervene that PSI was not solely focused on the litigation; it was (and remains) a potential competitor of the Company that has other business interests. *See* Dkt. 120. An award of legal fees and expenses is a narrow remedy. Other benefits bestowed on a company, beyond those produced by litigation, are beyond its scope. *See Raul*, 2014 WL 2795312, at \*6 ("A general allocation of the costs incurred by good Samaritans untethered to a meritorious (actual or potential) cause of action would drastically expand the jurisdiction of this Court, and usurp a core function of the board of directors.").

The only expense that PSI might hypothetically be able to recover under a *quantum meruit* theory is the approximately $2 million that PSI expended to fund Judy's lawyers in the actual Judy Litigation.[26] In the PSI Settlement Agreement, the Company paid PSI $4,198.618.40. Thus even assuming for the sake of argument that PSI could

---

[25] *See United Vanguard Fund, Inc. v. Takecare, Inc.*, 727 A.2d 844, 855 (Del. Ch. 1998) ("I am aware of no authority, nor has any been provided, to support the payment of such fees for non-litigation matters."); *see also Waterside P'rs*, 739 A.2d at 770 (denying award for initiating a proxy fight); *Raul*, 2014 WL 2795312, at \*7; *Bird*, 681 A.2d at 407.

[26] Even that figure represents a ceiling, rather than the likely amount that would be awarded. The $2 million figure appears high, because PSI negotiated a substantial discount to the Potter Anderson fee, and Downs did not know whether it had been deducted from the total. Dkt. 529, Ex. 60 at 84–85. The fee totals also included tasks that benefitted PSI but which did not benefit the Company, such as Duane Morris' efforts to compel Potter Anderson to release its attorneys' lien and turn over documents, and the advice Duane Morris provided to represent Downs in her efforts to buy shares from third parties. It is also not clear that a *quantum meruit* award would value the services provided at the full amount of the $2 million that PSI has claimed.

43

recover those fees, PSI already has received more than the greatest amount to which it might theoretically be entitled.

## III.    CONCLUSION

PSI's motion to recover an award of attorneys' fees and expenses is denied.